Amparo FIGUEROA–OLMO, et
al., Plaintiffs,

v.

WESTINGHOUSE ELECTRIC CORPO-
RATION, Defendant-Counterclaimant
and Third-Party Plaintiff,

v.

PUERTO RICO HIGHWAYS AUTHORI-
TY, Evelester Noriega De Cortez, the
conjugal partnership constituted by
Evelester Noriega de Cortez and Dr.
Gilberto Cortez Figueroa; ABC Insur-
ance Company and XYZ Insurance
Company, Third-Party Defendants.

Milagros Contreras MERCED,
Plaintiff-Counterdefendant,

v.

WESTINGHOUSE ELECTRIC CORPO-
RATION, Defendant-Counterclaimant
and Third-Party Plaintiff,

v.

PUERTO RICO HIGHWAYS AUTHORI-
TY, et al., Third-Party Defendants.

Nos. Civ. 82–2518CC, Civ. 82–2828CC.

United States District Court,
D. Puerto Rico.

Sept. 3, 1985.

As Amended Sept. 11, 1985.

Víctor Rodón-Elizalde, Rafael E. García-
Rodón Oscar González-Badillo, Hato Rey,
P.R., for plaintiffs.

Antonio Gnocci-Franco, O'Neill & Borg-
es, Hato Rey, P.R., José E. Fernández-Sein,
Santurce, P.R., Ernesto Rodríguez-Surís,
San Juan, P.R., Miguel Giménez-Muñoz,
Old San Juan, P.R., Frederick Auld, San
Juan, P.R., for defendants.

## OPINION AND ORDER

CEREZO, District Judge.

A traffic accident in which four persons
lost their lives when the truck they were
riding in collided with a trailer that was
crossing a highway near the outskirts of
metropolitan San Juan is the subject of the
present consolidated actions for damages
brought by forty relatives of the deceased
against the owner of the trailer, Westing-
house Electric Corporation (Westinghouse).
Federal jurisdiction is premised on diversi-
ty of citizenship between plaintiffs, resi-
dents of Puerto Rico, and defendant, resi-

dent of Pennsylvania,[1] for a claim in excess of twenty-seven million dollars.[2] Presently before us are sundry motions to review, oppose or adopt an Opinion and Order issued by Magistrate Arenas on July 30, 1984 regarding the possibility that joint representation of all plaintiffs, except for Milagros Contreras Merced,[3] by the law firm of Naveira-Rodón[4] may pose a conflict of interest situation. Another set of motions addresses the Report and Recommendation issued on September 28, 1984 in which the Magistrate recommends that Westinghouse's partial motion for summary judgment be granted and that plaintiffs' motions to dismiss the counterclaim and third-party complaint be denied. The Westinghouse motion requested that these plaintiffs who are also heirs of the deceased and who have filed claims as heirs on behalf of the estate be declared to have implicitly accepted the inheritance. In a well-documented Opinion and Order the Magistrate determined that there existed the possibility of a conflict of interest, but that it could be surpassed if the attorneys involved made a full disclosure to their clients and these accepted being jointly represented by them.

Before determining whether the Magistrate's ruling on the conflict of interests matter is correct, it is necessary to consider the procedural and factual framework of this case. In the original complaint filed on October 19, 1982 and in the first amended complaint of November 18, 1982 those plaintiffs who also were heirs of the deceased made claims as representatives and on behalf of the estates of their respective decedents. In the consolidated action filed by Milagros Contreras-Merced, Civil 82–2828, Westinghouse filed a counterclaim on January 31, 1983 to set-off the percentage of negligence that could be attributed to her deceased husband, one of the passengers riding in the front seat of the truck that collided with its trailer. In this same case, Westinghouse filed a third-party complaint against all forty plaintiffs in Civil 82–2518 for contributory negligence and to set-off whatever amounts it may be ordered to pay plaintiffs in proportion to the degree of negligence that may be attributed to the decedents.[5] The third-party

1. It should be noted that plaintiffs initially alleged they were all residents of Puerto Rico but later said that some were not. No formal pleading has been made as to the exact residence of these plaintiffs, although the record reveals that some are residents of Texas and Florida. The amended complaint only indicates that defendant corporation does not have a principal place of business in Puerto Rico and does not state whether this is also true as to the other states in which the other plaintiffs reside.

2. There is a pending motion requesting leave to amend the complaint to increase the damages to more than thirty-seven million.

3. This plaintiff was originally represented by the Naveira-Rodón law firm and was included in the caption of the complaint filed on October 19, 1982. However, on November 18, 1982 these attorneys withdrew their representation and informed the court that attorney Harvey Nachman would undertake her representation. On that same date, they filed an amended complaint withdrawing the claims of Milagros Contreras-Merced for she was not mentioned in the pleadings or included in the caption. On November 30, 1982, the court ordered the Naveira-Rodón law firm to continue representing plaintiff Milagros Contreras-Merced until the new attorneys made an appearance. Attorney José Fernández-Seín of the Nachman law firm made a formal appearance assuming Contreras' representation on December 28, 1982. Civil 82–2828, an action filed by said plaintiff on November 12, 1982, was consolidated with this case. The record reveals that plaintiff Milagros Contreras-Merced is the wife of one of the passengers who died. In Civil 82–2518, one of the plaintiffs is the common-law wife of Milagros Contreras-Merced's husband.

4. Most of the appearances for these plaintiffs have been made by Miriam Naveira-de-Rodón or by Víctor Rodón-Elisalde, Esqs. However, there have also been some appearances by attorneys Oscar González-Badillo and Rafael García-Rodón. Miriam Neveira-de-Rodón is no longer an attorney in this case due to her appointment as Associate Justice of the Supreme Court of Puerto Rico.

5. Westinghouse's contributory negligence theory against plaintiffs rests on the assumption that the driver of the truck while speeding on a wet road lost control of the vehicle and collided with the side of Westinghouse's trailer when the trailer had already crossed the traffic lanes plaintiffs' decedents were traveling on and was already on the opposite bound lanes. As to the passengers, Westinghouse contends that four persons riding on the front seat of a truck hindered the truck driver's freedom of movement and his ability to control the vehicle.

action also included Evelester Noriega-de-Cortez, her husband Dr. Gilberto Cortez-Figueroa and their conjugal society and the Puerto Rico Highway Authority as possible tortfeasors.[6] Third-party defendants (plaintiffs in Civil 82–2518) acknowledged receipt of the third-party complaint. Meanwhile, the plaintiffs in Civil 82–2518 filed answers to interrogatories during the first week of March 1983 where those who were also heirs of the deceased answered, under oath, that they were making claims on behalf of the estate.[7] On March 21, 1983, plaintiffs in Civil 82–2518 filed a second amended complaint which incorporated by reference all their previous claims on behalf of the estate but increased the amount of damages of several of them from the hundred thousands to the millions. The change was apparently requested and granted in a previous status conference before Magistrate Castellanos. On March 25, 1983, Civil 82–2828 was consolidated with Civil 82–2518. On April 12, 1983 plaintiffs in Civil 82–2518 filed an informative motion stating that they had misnumbered the paragraphs of their complaint, that they wished to increase the amount of damages and that in order to dispel any confusion they tendered a second amended complaint which included these changes, with correctly numbered paragraphs.

A close review of this second amended complaint reveals that it is more than a simple amendment of the amount of damages and a numerical correction. The claims on behalf of the estate were dropped and the caption was changed to eliminate the reference to plaintiffs as representatives of the estates. Plaintiffs in Civil 82–2518 now claimed only in their individual capacities for their own suffering and for loss of financial support, in the case of those who were dependents of the deceased. None of this was explained in the informative motion filed on April 12, 1983. Westinghouse answered the second amended complaint on April 18, 1983 and asserted counterclaims for set-off on the contributory negligence of plaintiffs' decedents. On April 28, 1983 it also filed a third-party complaint against the other third-party defendants in Civil 82–2828, the Cortez and the Puerto Rico Highway Authority, based on the same claims asserted in their third-party action against them in Civil 82–2828.[8] The tendered complaint was ordered filed on April 21, 1983.

6. The Cortez third-party defendants are included as possible tortfeasors because they were allegedly traveling next to the decedent's truck when the accident occurred and prevented the truck from maneuvering. The Puerto Rico Highway Authority is brought in for failing to provide the highway at the intersection where the accident occurred with adequate safety measures.

7. These claims were for the value of the truck destroyed in the accident which was owned by the driver, Francisco Figueroa-Olmo and for loss of income for each of the deceased. They will be discussed in detail when the issue of the acceptance of the estate is explored.

8. The purpose behind Rule 42(a), Fed.R.Civ.P., of avoiding duplicity and inconvenience by consolidating certain type of cases was defeated by the awkward circumstances leading to consolidation in this case. The most appropriate procedural mechanism for plaintiff Milagros Contreras-Merced's situation, given her sudden disappearance from the initial complaint, would have been to request a Rule 20(a), Fed.R.Civ.P., joinder since her claim arose from the same transaction. *See gen.:* 7, Wright & Miller, *Federal Practice and Procedure,* Section 1656. A Rule 42(a), Fed.R.Civ.P., consolidation which permits the joint adjudication of common questions on law or fact was unnecessary and only served to complicate matters given the parties' artificially different positions in each of the cases and the twin filings required given the separate identity of each case. *See gen.:* Wright & Miller, *supra,* Section 2382. We attribute the delay caused by this incident to the common practice of requesting "consolidation" for every situation of similar parties, claims or defenses. The whole matter might have been avoided if plaintiffs' attorney would have informed the court of their minor dilemma. A simple motion by Contreras-Merced's new attorneys stating that they either reasserted her original pleadings or wished to modify them would have been sufficient. The fact that one is withdrawing as legal representative of a client during litigation does not justify undoing all previous filings made while one was representing that client.

On May 2, 1983 those who were plaintiffs in Civil 82–2518 and third-party defendants in Civil 82–2828 filed a motion to dismiss Westinghouse's third-party complaint in Civil 82–2828 and on May 10 a motion to dismiss Westinghouse's counterclaims in Civil 82–2518. Both motions were based on the same grounds.[9] Thereafter, the parties continued to argue both motions on identical grounds but in dual filings which in turn were photocopied so that the dual filings could be made in each of the two consolidated cases. The end result is a record approximately twenty inches high.

The ground for dismissal of the counterclaims is that under Puerto Rican law a victim's negligence cannot be attributed to a claimant. Westinghouse countered saying that its claims were only against those plaintiffs who are also legal heirs of the decedents.[10] Westinghouse contends that these heir-plaintiffs implicitly accepted their decedent's estate, with its assets and liabilities, by filing the initial complaints and in their sworn answers to interrogatories reasserting their claims on behalf of the estate. This argument triggered a motion by Westinghouse seeking partial summary judgment on the issue of the acceptance of the estate. In the midst of this, Westinghouse raised the possibility of a conflict of interests due to the joint representation of plaintiff heirs and non-heir plaintiffs. This brought on a burst of activity that added inches to the file of these consolidated cases.

Westinghouse's main concern with the joint representation of plaintiffs is that there are opposing interests and positions among them which could require independent counseling. It has called our atten-

tion to copies of several statements and a report by a district attorney in the criminal case brought against the driver of Westinghouse's trailer in which this driver was exonerated that allegedly point to the decedents' negligence as the possible cause of the accident. Given the possibility of negligence of the deceased, Westinghouse contends that non-heir plaintiffs should have the opportunity to present a case against the other plaintiffs who are heirs of the driver or of the passengers in the truck for their part in causing the accident while the heir plaintiffs should have the opportunity to litigate among themselves the other decedents' negligence in order to reduce their own and protect their compensation instead of resting their entire case against Westinghouse. It understands that this problem arose from the moment that all these plaintiffs with potentially conflicting interests sought advice from this law firm and this single firm made all the decisions on how to channel their claims. It understands that these considerations prevent plaintiffs' attorneys from representing all of them without violating the prohibition against conflict of interests in the representation of a client. The attorneys for plaintiffs in Civil 82–2518 have consistently sustained that there is no actual or potential conflict of interest.[11] They urge that before filing the complaint they made an extensive investigation of the case and concluded that Westinghouse was solely liable for the deaths of their clients' relatives. They argue that no conflict could possibly arise for the right to set-off between joint tortfeasors only accrues when the tortfeasor pays the victim. They also believe that discovery thus far supports their initial conclusion that all the evidence points

9. The motion to dismiss the third-party action, however, also contained a procedural challenge to the adequacy of the third-party action to bring forth the compensation claim.

10. Westinghouse explained that it had sued all plaintiffs because it was not sure who were the legal heirs. It did not accept plaintiffs' pleadings as to who were the heirs because their pleadings as to residence proved to be errone-

ous. Westinghouse has requested leave to amend its counterclaim and third party complaint to eliminate those parties who it now knows are not the legal heirs.

11. Their filing of May 6, 1985, states that "no conflict of interest exist in this case, nor is there a possibility of a conflict of interests."

to Westinghouse as the only party responsible for the accident.

The Magistrate found that, although no *actual* conflict of interest had yet surfaced since no determination has been made on the possible causes of the accident, a potential conflict did exist which required action by the court. The Magistrate did not adopt the remedy of instant disqualification suggested by Westinghouse, and, based on federal caselaw interpreting the American Bar Association ethics standards, understood that if plaintiffs' attorneys made a full disclosure to their clients of the possible conflicts involved and they consented and desired to continue being represented by them, then disqualification would not be necessary. Plaintiffs' attorneys objected to such disclosure and consent for no finding was made on the existence of an actual conflict or even a potential one. They objected also to the Magistrate's not imposing sanctions on Westinghouse's attorneys for raising an issue as frivolous as this one, considered as a mere dilatory tactic intended to damage their professional reputation. Westinghouse objected to the Magistrate's ruling as based on mistaken ethics guidelines. It contends that Local Rule 33–IVB mandates that he follow the position adopted by the Supreme Court of Puerto Rico which requires disqualification even if the client's consent is obtained. On December 20, 1984, without abandoning their position that no potential or actual conflict of interests exist, plaintiffs' attorneys filed several copies of identical unsworn statements, in Spanish, signed by their clients which were translated as follows:

### CERTIFICATION

I, the undersigned certify that today, September 19, 1984, I met with Atty.'s Víctor Rodón Elizalde and Miriam Naveira de Rodón, who are some of our attorneys as Plaintiff in case number 82–2518, 82–2828 before the Federal District Court for the District of Puerto Rico. Attorneys Rodón and Naveira de Rodón explained to me thoroughly and in detail of the possibility that a conflict of interests could arise between the Plaintiffs members of the different estates (sucesiones) of the deceased in the accident object of this case, who are represented by the same attorneys. After amply discussing the matter related with the possibility that a conflict of interests might arise, the effects and consequences related with the same, I have freely and spontaneously consented to continue with our present legal representation in the case.

At San Juan, Puerto Rico, today, September 19, 1984.[12]

Westinghouse contends that these statements do not constitute the full disclosure and informed consent required by the Magistrate.

We agree with the Magistrate's ruling that the discovery of a potential conflict of interest during the course of the litigation does not necessarily result in automatic disqualification. The attempt by the law firm to comply with the Magistrate's Opinion and Order is, however, insufficient.

According to Rule 72(a), Fed.R.Civ.P., the Court will modify or set aside any portion of a Magistrate's order found to be clearly erroneous or contrary to law. Westinghouse's argument against the Magistrate's order rests on the premise that when the Court approved former Local Rule 33–IVB's language that "The Code of Professional Responsibility adopted by this Court is the Code of Professional Responsibility adopted by the Supreme Court of the Commonwealth of Puerto Rico, as amended from time to time by that state court ..." it also accepted to be bound by whatever remedy and application of that Code the Supreme Court used in a particular disciplinary proceeding before it. The manner in which the Supreme Court of Puerto Rico

---

**12.** Only thirty-eight statements were filed. On the caption of their amended complaint of April 21, 1983, there are thirty-nine plaintiffs. This discrepancy must be looked into and explained.

applied its disciplinary code was, of course, useful precedent in our own interpretation of that code's application to a particular situation before us, but it is essential to understand that the primary responsibility for supervising the conduct of the attorneys who practice before this court lies precisely with this forum. This authority stems from the Court's inherent power to control and supervise the proceedings and the attorneys who practice before it. *See: In Re Corn Derivatives Antitrust Litigation,* 748 F.2d 157, 160 (3d Cir.1984); *Kevlic v. Goldstein,* 724 F.2d 844, 847 (1st Cir.1984); *Schloetter v. Railoc of Indiana, Inc.,* 546 F.2d 706, 710 (7th Cir.1976); *Glover v. Libman,* 578 F.Supp. 748, 750 (N.D. Ga.1983); *Triplett v. Azordegan,* 421 F.Supp. 998, 1001 (N.D.Iowa, 1976) and former Local Rule 33–XII. Although reference to how the supreme court, of a district where the federal court sits, applies its code of professional conduct is helpful, *see: Unified Sewerage Agency, etc. v. Jelco, Inc.,* 646 F.2d 1339, 1342 at n. 1 (9th Cir. 1981), the resolution of problems of this nature which may arise in a federal case is a matter of federal law entrusted to the discretion of the federal district court. *See: Cord v. Smith,* 338 F.2d 516, 524 (9th Cir.1964). *Cf. Black v. State of Mo.,* 492 F.Supp. 848, 874–75 (W.D.Missouri, 1980) (court rejected Advisory Committee of Missouri's Bar recommendation as to ethical problem before the court because final resolution of the matter lies with the court entrusted to supervise the attorneys practicing before it). We respect and duly consider the interpretations of the Supreme Court of Puerto Rico of the Canons of Ethics of Puerto Rico,[13] but believe that former Rule 33–IVB did not mandate that we follow blindly each opinion rendered by that court on the kind of remedy that a particular ethical violation before it required. In any event, Westinghouse's argument has lost whatever persuasive force it may have had with the adoption of the new Local Rules for this District which became effective on November 1, 1984. New Local Rule 211.5(a) refers attorneys who practice before this Court to the Model Rules of Professional Conduct adopted by the American Bar Association on August 2, 1983. Although the Magistrate did not specify that he was basing his remedy on these Model Rules, his decision is consonant with them. It should be noted that the Model Rules themselves, as stated in the Preamble, "are rules of reason /that/ do not exhaust the moral and ethical considerations that should inform a lawyer for no worthwhile human activity can be completely defined by legal rules. The Rules simply provide a framework for the ethical practice of law." This flexible approach allows the court to exercise its disciplinary powers more appropriately than would a knee-jerk approach compelling automatic disqualification on the mere possibility of a conflict. Such an approach might well encourage the filing of frivolous motions for disqualification for dilatory purposes. As stated by Judge Markey in *State of Ark. v. Dean Foods Products Co., Inc.,* 605 F.2d 380, 383 (8th Cir.1979):

> Disqualification in spasm reaction to every situation capable of appearing improper to the jaundiced cynic is as goal-defeating as failure to disqualify in blind disregard of flagrant conflicts of interest. Between those ethical extremes lie less obvious influences on the interest of society in the orderly administration of justice, on the interest of clients in candid consultation and choice of counsel, and on the interest of the legal profession in its reputational soul.

**13.** In recent dicta the Supreme Court has disfavored the informed consent approach, see: *In Re Carreras Rovira and Suárez Zayas,* A–84–7/A–84–6, Opinion of November 7, 1984, 84 JTS 94 at p. 3764 ("In our jurisdiction the client's autonomy does not extend to the point of permitting the legal representation by an informed and voluntary consent when there exists a possibility of a conflict of interest.... Our canon 21 expressly prohibits it.") (Our translation.) *See also: Sánchez Rodriguez v. López Jiménez,* R–84–279, 280 opinion of March 11, 1985, 85 JTS 16 at p. 3877.

*Id.* at 383. *See also: Corn Derivatives Litigation*, 748 F.2d at p. 160; *International Business Machines Corp. v. Levin*, 579 F.2d 271, 279 (3d Cir.1978); *Woods v. Covington Cty. Bank*, 537 F.2d 804, 809 (5th Cir.1976); *Glover*, 578 F.Supp. at 750; *Freschi v. Grand Coal Venture*, 564 F.Supp. 414 at 417 (S.D.N.Y.1983).

▪▪▪ According to Model Rule 1.7(b),[14] disqualification of counsel on grounds of potential conflicting interests in multiple client representation in the same lawsuit is not automatic but may depend on whether the clients agree to being so represented after having been informed of all the risks and disadvantages involved. *See e.g.: Unified Sewerage Agency, etc., v. Jelco, Inc.*, 646 F.2d 1339, 1347–50 (9th Cir.1981). *See gen.:* Moore, *Conflicts of Interest in the Simultaneous Representation of Multiple Clients: A Proposed Solution to the Current Confusion and Controversy*, 61 Tex.L.Rev. 211 (Oct. 1982); *Developments in the Law—Conflicts of Interest in the Legal Profession*, 94 Harv.L.Rev. 1244 (1981). The premise behind this pragmatic approach is to safeguard a person's right to hire a particular attorney of certain expertise who may not be affordable except by the joint resources of various litigants who team up as plaintiffs or as defendants. *Id.* and *Conflicts of Interest: A Trial Lawyers Dilemma*, 1981, A.B.A. Section of Litigation, 109. Parties also have a right to control their litigation in light of whatever interests they consider more important and worthy of litigating. *See:* Moore, *supra* at 226–40 and *Developments, supra* at 1303–04. *Cf.: United States v. Bradshaw*, 719 F.2d 907, 911 (7th Cir.1983) (the constitutionally protected right to conflict-free counsel in criminal cases may be waived if the defendant consents to joint representation). However, the right to be represented by a particular attorney is not an unfettered one. Even informed consent may be insufficient to prevent disqualification, if it is not obvious to the court that the attorney will be able to represent all clients adequately, *see e.g. Sapienza v. New York News, Inc.*, 481 F.Supp. 676, 680 (S.D.N.Y. 1979) or if the court believes no waiver may cure the damage to the integrity of the judicial process that such joint representation will cause, *see: Bohack Corp. v. Gulf & Western Industries, Inc.*, 607 F.2d 258, 263 (2d Cir.1979); *Shadid v. Jackson* 521 F.Supp. 85, 90 (E.D.Tex.1981); *In Re Asbestos Cases*, 514 F.Supp. 914, 920 (E.D.Va. 1981). The court may also examine the circumstances surrounding the consent to determine if it was truly voluntary and informed. *See e.g.: Dunton v. County of Suffolk*, 729 F.2d 903, 908 (2d Cir.1984). It has also been held that if the conflicts of interest involve abuse of confidential information from the client rather than the mere possibility of disloyalty in advocacy during a litigation, the client's consent might be insufficient. *See: Westinghouse Elec. Corp. v. Gulf Oil Corp.*, 588 F.2d 221, 229 (7th Cir.1978). If the simultaneously represented clients' interests are or become actually opposed or directly adverse, then disqualification should be ordered. *See e.g.: U.S. Fid. & Guar. Co. v. Louis A. Roser Co.*, 585 F.2d 932, 939 (8th Cir.1978), *and also: Developments, supra* at 1292, *Conflicts of Interest, supra* at 108. *But see: Moore, supra* at 222 n. 46 and *Developments, supra* at 1307 n. 7 (it makes no difference whether the conflict is actual or potential, the fact that it is only potential may have been the result of how

---

**14.** Model Rule 1.7(b) states:

(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

(1) the lawyer reasonably believes the representation will not be adversely affected; and

(2) the client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

the attorney handled the case). Our circuit has cautioned that it is "more important that unethical conduct be prevented than that defendant have an unfettered right to counsel of its choice." *Kevlik*, 724 F.2d at 849.

In the situation before us, where the possible conflict arises within the context of an ongoing proceeding in which the parties' rights are yet to be established, the shaping of the conflict's profile will necessarily turn on the legal and strategical feasibility of the claims or defenses that, if raised, will create the actual adverse positions among plaintiffs. *See Moore, supra* at notes 11 and 25. For example, in *Aetna Cas. & Sur. Co. v. United States*, 570 F.2d 1197 (4th Cir.1978) the court reversed a ruling that a potential conflict existed in the joint defense by the United States attorney of the government and several air traffic controllers involved in an air crash because different legal positions as to the controller's personal liability could be raised. The circuit court considered that the alleged potential conflict was practically nonexistent since the applicable law would not support a finding of personal liability on the controllers. The court also rejected the district court's conclusion that the disclosure and consent were tainted because they were made through the same attorney with the alleged conflict. *Id.* at 1202. On the other hand, in *Dunton*, 729 F.2d 903, the appellate court found that the state of the law did support the potential for conflicts of interest in the joint representation of a police officer personally and the county where he worked. Since *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) held that municipalities may be held liable for civil rights violations, the court found that the interests of a municipality and its employee may be in conflict. As examples of possible conflicts the court expressed that "a municipality may avoid liability by showing that the employee was not acting within the scope of his official duties, because his unofficial actions would not be

pursuant to municipal policy. The employee, by contrast, may partially or completely avoid liability by showing that he was acting within the scope of his official duties." *Id.* at 907. In *Dunton* the circuit court found that disqualification was necessary because the county and police officer's attorney had in fact partaken of a trial strategy against the police officer's interests which resulted in a finding of personal liability on him. In the context of personal injury cases and joint tortfeasors, the possibility for potentially conflicting representations has been recognized, particularly in two-vehicle accidents where one attorney represents the driver and the passenger of one of the vehicles involved. *See i.e.: Woodruff v. Tomlin*, 616 F.2d 924 (6th Cir.1980) (in a legal malpractice suit, court held district court erred in refusing to permit jury to consider whether failure to advise passenger and driver clients represented jointly of possible actions against each other could be inadequate representation); *Tadier v. American Photocopy Equipment Co.*, 531 F.Supp. 35, 37 (S.D.N.Y. 1981) (conflict in representation of driver in accident case in federal court by father-driver and daughter-passenger as plaintiffs and of the daughter and the estate in a state action against the father was considered to have been surpassed by client's informed consent); *Weinberg v. Underwood*, 101 N.J.Super. 448, 244 A.2d 538 (1968) (court found that defendant's counterclaim for contributory negligence created a potential conflict in the defense of plaintiff's driver and passenger requiring disqualification of plaintiff's counsel and separate new attorneys for each one); *Jedwabny v. Philadelphia Transportation Company*, 390 Pa. 231, 135 A.2d 252 (1957) (same attorney could not represent passenger and driver of vehicle when driver was joined by defendant as an additional tortfeasor); *and In Re Shaw*, 88 N.J. 433, 443 A.2d 670; *Matter of Thornton*, 421 A.2d 1 (D.C.App.1980) (disciplinary proceedings against attorneys representing passenger and driver in two car collision cases for

failing to recognize conflict of interests in representing both). Nevertheless, there are conflicting views on this type of situation. *See Moore, supra,* at n. 11.

In the present case, although the potential conflict does depend on a number of contingencies such as the eventual determination of whether the inheritance was accepted, the real financial resources of the estate and the heirs, the degree of contributory negligence, if any, attributed to the deceased and the eventual determination of the "efficient" or legal cause of the accident, it is a reality that under the law in Puerto Rico these conflicting claims and defenses could be raised among plaintiffs. If the estate is accepted the heirs are held responsible for its liabilities and, thus, the non heirs as well as the heirs of the other estates could technically sue the estate for the negligence of their decedent. *See P.R. Laws Ann.,* Tit. 31 Section 2090; *Sosa v. Morales,* 58 P.R.R. 362, 365 (1941) *and cases there cited.* ("The personal action which arose in favor of Sosa against Juan Morales Díaz /for illegal attachment/ was not extinguished with the death of the latter, who by legal fiction is still alive, as far as his rights and duties, in the persons of his heirs.") We are not before a situation where the potential conflict is practically undetectable because the law would not support the possible conflicting positions among the parties. The law does support a conflicting position among them. Whether the facts eventually established heighten or diminish that possibility or whether, as a practical matter, it may be more feasible to sue only the tortfeasor with the most financial resources is another matter.

Plaintiffs' law firm, however, is mistaken when it ignores or refuses to recognize even the potential for conflict in their legal representation. They have repeatedly stated that they are convinced that all the evidence points to Westinghouse as the sole party responsible. They maintain that they made a thorough investigation of their case before filing it and were convinced of Westinghouse's sole liability. They contend that subsequent discovery after the case was filed proved their point. However, it verges on the point of temerity to allege that there is no evidence to support even the *possibility* of negligence on the part of the decedents of plaintiff-heirs when there are documents in the record which reveal that:[15] the accident occurred at an intersection when Westinghouse's trailer was entering the highway from a side road, the decedent's truck was totally destroyed—its front part hit the middle side of the trailer, the road was wet, the decedents had just come down from a hill in the highway, the decedents were allegedly going 50 MPH in a 40 MPH zone, they lost control of the truck they were riding in, skidded and hit the side of the trailer when it had already crossed the lanes the decedents were traveling in and was already at the opposite bound lanes and there were four people riding in the front seat of the truck. The fact that the attorneys may have "work-product" confidential affidavits of adverse witnesses changing their initial version does not eliminate the possibility that the jury might believe their initial version and find contributory negligence on the part of plaintiff-heirs' decedents or, for that matter, fix causation entirely on the acts of one of them and release Westinghouse from any liability, leaving plaintiffs without any remedy at all. The attorneys' overzealous defense of the ethics issue based on how good they believe their case is and on such technicalities as the point of accrual of the contribution compensation among joint tortfeasors is entirely out of focus and inapposite to the ethical question posed. Although the right to seek reimbursement from a joint tortfeasor accrues when a plaintiff is indemnified, this does not support the position that there can be no conflicts of interest among potential tortfeasor plaintiffs in their defense of the

---

**15.** We make no ruling on the eventual proof of these matters, we merely point them out as possibilities that should have been considered in plaintiff's evaluation of their case.

degree of negligence that may be imposed on them *before* the right to reimbursement accrues and which will determine the amount that will be reduced from their compensation. It could be to the advantage of some of the plaintiff heirs to defend the possible negligence of their decedent by pointing to one of the other decedents instead of resting their case solely on the evidence against Westinghouse. Reliance on the accrual argument also ignores that conflicting interests may have been present ever since these persons came to the attorney's office and they determined how the claims should be channeled, *i.e.:* who would be sued, where and for what claims, etc. The attorneys' reliance on the possible, *vis a vis,* actual conflict is also misplaced. The fact that the conflict has not developed into a detectable situation of adversity or injury is no reason for not taking measures to prevent harm to their clients by, at least, recognizing the possibility of the conflicts of interest and disclosing all the risks and disadvantages involved.[16] The heart of the ethics question lies precisely in first recognizing these potentially conflicting interests. Had the potential conflicts been recognized earlier in the litigation and had the attorneys presented their position on continuing joint representation only after making a full disclosure to their clients and receiving their informed consent, substantial hassle and delay could have been avoided. Had the attorneys for plaintiffs devoted less time to ardent arguments in numerous motions filled with self-serving statements and lit-

tle, if any, helpful authorities to guide the Magistrate, and had promptly informed their clients of all possible conflicts and risks in joint representation, their "simple tort case"[17] would be on its way to the jury by now.

■ We find that the Magistrate did not commit error in ruling that, although no actual conflict has been shown to exist, the potential for one is real and requires that plaintiffs' law firm make full disclosure to their clients and obtain their consent in order to avoid ethical problems and uncalled for complications in the litigation itself.

This brings us to the adequacy of the disclosure and consent statement which has been offered. Plaintiffs' decision to sue Westinghouse only may be based on sound practical reasons since there is also evidence to support a finding of liability on Westinghouse, the tortfeasor with the most financial resources. It would appear to be a satisfactory approach to join forces against the tortfeasor with the resources to provide compensation. If this was their decision, and there is prima facie evidence to support that this may have been an entirely reasonable strategy, plaintiffs cannot be forced to sue each other nor should we conclude that this was the only way they could have pursued their claims. However, their attorneys' contention that there is not even the possibility of conflict makes us reluctant to accept at face value the assertions of voluntariness and informed consent.

---

**16.** The injury that an actual conflict of interest in a legal representation may cause and the ensuing liabilities of the attorney to the injured clients and the latter remedies against third parties is another matter. *See: Woodruff,* 616 F.2d 924 (malpractice); *Kagel v. First Commonwealth Company, Ins.,* 534 F.2d 194, 195 (9th Cir.1976) (conflicts of interest used by clients in proceeding to impugn judgment against them was rejected by the court); *Intern. Sound Technicians v. Intern. Alliance, Etc.,* 611 F.2d 266, 269 (9th Cir.1979) (court rejected claim that settlement was void because of conflicts of interest in legal representation). Our ruling on the ethics question is not preclusive or determi-

native of any rights which may arise from these attorneys' conduct. *See Sartain v. Sec. Exch. Comm.,* 601 F.2d 1366, 1375–76 (9th Cir.1979).

**17.** The Naveira-Rodón attorneys believe theirs is a simple tort action. However, the case involves the deaths of four persons whose forty or fifty relatives are suing for more than twenty-seven million dollars. The conflicting versions as to causation place this case far from a simple tort case. The attorneys' perception of their case concerns us for it reflects on their ability to recognize the potential conflicts of their clients.

It is this court's duty to ascertain whether the consent was voluntary and informed before approving the joint representation, see: *Dunton*, 729 F.2d at 908; *Musicus v. Westinghouse Elec. Corp.*, 621 F.2d 742, 744 (5th Cir.1981); *and gen.: Kevlik v. Goldstein*, 724 F.2d at 847. Accordingly, the law firm representing plaintiffs in Civil 82–2518 are hereby ORDERED to submit to their clients the following questions which will be translated if necessary to Spanish and answered under oath by their clients or their legal representatives when applicable. These questions shall be explained to their clients who shall also be told that they have a right to consult an independent attorney, if they so wish, on any doubts that they may have as to the questions themselves or possible conflicting situations. The questions to be asked are the following:

1. Are you aware that the passengers or driver who died in this accident could be found by the court or by the jury to have been partially or entirely responsible for the damages caused?

2. Are you aware that you have the option of suing the heirs of any one of the deceased to recover your damages from the heirs as well as from Westinghouse?

3. (Plaintiffs-heirs only) Are you aware that if your decedent is found partially negligent the amount of damages that you may receive will be reduced in proportion to the degree of negligence attributed to your decedent?

4. (Plaintiffs-heirs only) Are you aware that you have the option of trying to prove that the other decedents, as well as Westinghouse, were negligent in order to reduce the amount of negligence that may be imposed on you and thus obtain a higher compensation?

5. Are you aware that you have the option of suing the other plaintiff-heirs that have accepted the inheritance "purely and simply" for the negligence of their decedents and that you can recover not only from the estate but from these plaintiffs' additional personal property?

6. (Plaintiffs-heirs only) Are you aware that by filing claims for the estate it may be understood by the court that you have accepted the estate with all its liabilities and may be held responsible for the debts of the estate and for the decedent's negligent acts in this case if proven?

7. Are you aware that if any of the deceased or all of them are found to have been entirely responsible for the accident you will not recover anything?

8. Are you aware that by not suing the other plaintiffs heirs you are abandoning the possibility of obtaining compensation from an alternative source other than Westinghouse should the court find that Westinghouse was not responsible?

9. Have you discussed all of these possibilities with your attorneys?

10. After considering all of this, is it your decision to continue being represented by the attorneys who have represented you up to now?

Since the record reveals that there are minors, possible mental incompetents and illiterate deaf-mutes [18] among plaintiffs their attorneys shall make the proper arrangements with the pertinent Commonwealth of Puerto Rico authorities to furnish them with the above-mentioned questionnaire and with whatever additional information required by these authorities in order for them to protect the interests of those without the necessary capacity to understand. It will be the attorneys' responsibility to see to it that all incompetents among plaintiffs are duly represented by the proper authorities and that the con-

---

18. Plaintiffs indicate in the caption of the amended complaint that many of them are minors. Through motion requesting permission to amend they indicate that plaintiff María Luisa Caban was found by the Social Security Administration to be mentally disabled and in one of their statements they indicate that Aida de Jesús being deaf-mute and illiterate signed her statement through the only person who can communicate with her.

sent of all plaintiffs be one based on an objective explanation of all the risks and disadvantages involved. We suggest that the attorneys follow the guidelines for disclosure proposed in *Moore, supra* at pp. 241–245. The attorneys shall also make all the necessary arrangements to have these sworn answers filed no later than November 1, 1985. The court will hold in abeyance its ruling on whether the attorneys should be disqualified pending the filing of these sworn answers.

SO ORDERED.