COMBUSTION ENGINEERING CARIBE, INC., et al., Plaintiffs,

v.

GEO P. REINTJES CO., INC., et al., Defendants.

No. CIV. 02–2466(RLA).

United States District Court, D. Puerto Rico.

Dec. 23, 2003.

José A. Axtmayer, Axtmayer, PSC, San Juan, PR, G. William Quatman, G. Edgar James, Joseph J. Mellon, Shughart Thomson & Kilroy, Kansas City, MO, for Plaintiff or Petitioner.

Rafael A. Rosado–Marrero, Jimenez Graffam & Lausell, San Juan, PR, Duane J. Fox, Seigfreid Bingham Levy Selzer & Gee, Kansas City, MO, Roberto Santana Aparicio, Esq., Del Toro & Santana, San Juan, PR, Conrad J. Lazo, George J. Dramis, David E. Gurley; Gurley & Dramis, Sarasota, FL, for Defendant or Respondent.

### ORDER DENYING MOTION FOR DISQUALIFICATION OF COUNSEL

ACOSTA, District Judge.

Plaintiffs have moved the court to disqualify SEIGFRIED, BINGHAM, LEVY, SELZER & GEE, P.C., the law firm representing codefendant GEO P. REINTJES CO., INC. ("REINTJES") in this case due to an alleged conflict of interest originated by DUANE J. FOX, ESQ., one of its members, in having also acted as counsel for J.R. INSULATION SALES & SERVICE ("JRISS"), a non-party, during the taking of the deposition of two of its officers by plaintiffs herein. Additionally, movants have requested the imposition of

sanctions based on objections raised by MR. FOX during the aforementioned depositions regarding inquiries into his attorney-client relationship with JRISS.

## FACTUAL BACKGROUND

Plaintiffs' claims arise from a contract for the design and construction of portions of a coal burning "co-generation" power plant located in Guayama, Puerto Rico owned by AES PUERTO RICO, L.P. ("AES").[1]

AES contracted with DUKE/FLUOR DANIEL CARIBBEAN, S.E. ("DUKE/FLUOR DANIEL") as its prime contractor to design and build the project.

Subsequently, plaintiff ALSTOM POWER, INC. ("ALSTOM") became a first-tier subcontractor for DUKE/FLUOR DANIEL and with its consent, plaintiff COMBUSTION ENGINEERING CARIBE, INC. ("CE–CARIBE") was assigned part of ALSTOM's subcontract.

Thereafter, both plaintiffs entered into separate second-tier subcontracts with codefendant REINTJES. Pursuant to its agreement with ALSTOM codefendant REINTJES was responsible for designing the refractory insulation for the plant as well as supplying the materials necessary for that work, i.e., the "Design and Materials Contract".

On the other hand, through its contract with CE–CARIBE codefendant REINTJES agreed to perform the labor necessary to install the refractory insulation, i.e., "Labor Contract". According to plaintiffs, codefendant's obligations under the Labor Contract were guaranteed by two separate bonds issued by ST. PAUL FIRE AND MARINE INSURANCE CO. ("ST.PAUL"). A Performance Bond sought to protect CE–CARIBE in the event that REINTJES failed to comply with its contract and warranty obligations whereas a Payment Bond was intended to protect codefendant's unpaid subcontractors as well as safeguard CE–CARIBE from claims or liens by such subcontractors.

Plaintiffs further contend that codefendant REINTJES entered into an Indemnity Agreement with ST. PAUL for any

1. The following diagram outlines the relationship of the entities involved in the design and construction of the AES plant:

**AES**
(Plant owner)

**DUKE/FLUOR DANIEL**
(Prime contractor)

| **ALSTOM** | **CE–CARIBE** |
|---|---|
| First-tier subcontractor | Assignee/First-tier subcontractor |
| **REINTJES** | **REINTJES** |
| Second-tier subcontractor | Second-tier subcontractor |
| "Design & Materials Contract" | "Labor Contract" * |
| **RHI/HARBISON WALKER** | **JRISS** |
| Third-tier subcontractor | Third-tier subcontractor |
| Design & supply material | Installation labor |
| Bankruptcy | Bankruptcy |

**\*ST. PAUL FIRE & MARINE**
–Performance Bond
–Payment Bond

damages or costs incurred under the bonds.

REINTJES in turn entered into third-tier subcontracts for both the Material as well as the Design and Material Contracts. Codefendant REINTJES subcontracted the majority of its installation labor to JRISS, a Puerto Rico corporation dedicated primarily to insulation work, and with RHI/HARBISON WALKER to design the refractory work and supply the installation material.

Both JRISS and RHI/HARBISON WALKER are currently under the bankruptcy court's jurisdiction.[2]

## THE PLEADINGS

The outstanding complaint was filed by CE–CARIBE and ALSTOM against REINTJES and ST. PAUL.[3]

Plaintiff CE–CARIBE seeks damages from REINTJES purportedly caused by a breach of contract, delays in completion of work, as well as defective installation of refractory materials. CE–CARIBE further calls for a declaratory judgment determining the validity of the bonds issued by ST. PAUL as well as the surety's obligation to pay thereunder.

Plaintiff ALSTOM on the other hand demands REINTJES payment for damages caused by alleged failures in refractory materials and defective design.

REINTJES counter-claimed[4] against both plaintiffs for failure to pay invoiced payments and for extra labor charges and overtime purportedly resulting from delays and disruptions in the refractor work.

ST. PAUL also filed a counter-claim[5] against plaintiff challenging the validity of the bonds.

## JRISS' INTERESTS

According to plaintiffs' motion, the project work carried out by REINTJES and JRISS concluded in April 2002 and approximately two to three months thereafter REINTJES "submitted a series of invoices to CE–Caribe for millions of dollars in alleged extra labor costs" caused by delays in construction. Plaintiffs' Motion for Disqualification (docket No. 70 ¶ 11(a) p.7). Plaintiffs further note that "[a]ccording to Reintjes' original claim, its local subcontractor JRISS planned to work only 94,000 man-hours but actually worked 179,068 man-hours from October 2000 through April 2002. **It is largely those extra hours that are in dispute and form the basis of Reintjes' claim.**" *Id.*, ¶ 11(b) p. 8 (emphasis ours).

Pursuant to the documents submitted together with plaintiffs' motion, JRISS, which is not a party to this case, has an outstanding claim against REINTJES for over one million dollars for refractory work performed under the contract. On two separate occasions JRISS requested

---

**2.** JRISS filed for Chapter 11 protection in the U.S. Bankruptcy Court for this district on February 28, 2003. *See In re: J.R. Insulation Sales & Service, Inc.,* Case No. 03–02050(GAC).

**3.** A parallel proceeding was previously initiated by REINTJES in the U.S. District Court for the Western District of Missouri, *Geo P. Reintjes Co. Inc. v. Alstom Power, Inc.,* Case No. 02–0657–CV–W–GAF. That action was subsequently transferred to this District and the parties realigned under a single consoli-

dated pleading.*See,* Amended Consolidated Complaint, filed on June 12, 2003 (docket No. 50).

**4.** *See* Reintjes' Answer to Amended Consolidated Complaint and Counterclaim, filed on June 16, 2003 (docket No. 52).

**5.** *See* Defendant's St. Paul Fire and Marine Insurance Co. Answer... and Counterclaim, filed on July 3, 2003 (docket No. 59).

AES, DUKE/FLOUR DANIEL as well as plaintiffs herein to withhold payment of any monies due REINTJES until codefendant had satisfied JRISS's debt. Additionally, JRISS sought payment of its outstanding claim from ST. PAUL.

Plaintiffs also note that according to the evidence on record JRISS owes REINTJES approximately $35,761.00 in back charges for material purchased by REINTJES on behalf of JRISS. Further, REINTJES acknowledged that it will seek reimbursement from JRISS for any damages assessed against codefendant REINTJES in these proceedings for defective insulation work.

## EVENTS TRIGGERING THE CONFLICT OF INTEREST

The depositions of FELIX CAMACHO and JOSE ORTIZ, JRISS' project manager and president respectively, were taken by plaintiffs on May 19, 20 and 21, 2003. During these depositions MR. FOX mentioned for the first time that he was also appearing on behalf of JRISS. Plaintiffs argue this dual representation of entities whose interests are directly adverse to each other triggered a conflict of interest which warrants disqualification of both MR. FOX and his law firm.

## DISQUALIFICATION—STANDING AND APPLICABLE STANDARD

REINTJES questions plaintiffs' standing to bring this matter to the court's attention. Even though some jurisdictions have sided with REINTJES's position,[6] in our jurisdiction non-parties to the attorney-client relationship have been found suitable to alert the court as to possible ethical violations including conflict of inter-

ests via motions to disqualify opposing counsel. *Kevlik v. Goldstein,* 724 F.2d 844, 848 (1st Cir.1984). *See also, Reyes Cañada v. Rey–Hernandez,* 193 F.Supp.2d 409, 411 (D.P.R.2002) ("motion to disqualify an attorney is an accepted and adequate resource for a party to bring a potential conflict of interest to the court's attention."); *Somascan Plaza, Inc. v. Siemens Med. Sys., Inc.,* 187 F.R.D. 34, 37 (D.P.R. 1999) ("motion to disqualify an attorney is an accepted and adequate way for a litigant to bring a potential conflict of interest to the court's attention.")

██ However, the notion of someone extraneous to an attorney-client relationship raising the specter of a conflict of interest stemming precisely from this privity and which may result in the removal of counsel of choice raises valid and competing concerns. The risk of this mechanism being used for tactical or strategic purposes by opposing parties in a litigation must be weighed by the court as well as the effect of negating chosen attorney. *Kevlik,* 724 F.2d at 848; *Reyes Cañada,* 193 F.Supp.2d at 411; *Somascan,* 187 F.R.D. at 37. Therefore, motions to disqualify submitted by non-parties to the relationship must be examined with caution. The "mere possibility of a conflict" will not do. *Reyes Cañada,* 193 F.Supp.2d at 411 (citing *Somascan,* 187 F.R.D. at 37). "[C]ourts must balance a client's right to be represented by an attorney of their choice and the integrity of the legal system." *Somascan,* 187 F.R.D. at 37.

A disqualification motion implicates a wide range of interests, including a client's right to counsel of his choice, the hardship suffered by a party whose lawyer is disqualified, the financial burden

6. *See,* Douglas R. Richmond, *The Rude Question of Standing in Attorney Disqualification Disputes,* 25 Am. J. Trial Advoc. 17 (2001) for a discussion of the diverging approaches to privity as a standing requirement.

of a client to replace disqualified counsel, lawyers' mobility, lawyers' interests in representing particular clients, lawyers' ability to trade on their expertise and to market their practice specialties, the preservation of the attorney-client relationship and client confidences, and the maintenance of the legal profession's ethical standards.

Douglas R. Richmond, *The Rude Question of Standing in Attorney Disqualification Disputes,* 25 Am. J. Trial Advoc. 17, 22–3 (2001). *See also,* Alexander W. Jones, Student Commentary, *Defenses to Disqualification: Fact Situations that Allow an Attorney to Avoid Disqualification for a Conflict of Interest,* 27 J. Legal Prof. 195 (2002–2003).

We shall examine counsel's conduct at issue within the purview of Rule 1.7 of the Model Rules of Prof'l Conduct adopted by the American Bar Association in 1983 in effect in this District at the time the depositions were taken.[7]

Rule 1.7 regulates counsel's conflict of interest comportment in instances of simultaneous representation.[8] In its 1983 version Rule 1.7 provides:

(a) A lawyer shall not represent a client if the representation of that client will be **directly adverse** to another client, **unless:**

(1) the lawyer **reasonably believes** the representation will not adversely affect the relationship with the other client; **and**

(2) each client **consents** after consultation.

(b) A lawyer shall not represent a client if the **representation** of that client may be **materially limited** by the lawyer's responsibilities to another client or to a third person, or by the layer's own interests, unless:

(1) the lawyer **reasonably believes** the representation will not be aversely affected; and

(2) the client **consents** after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the **common representation** and the advantages and risks involved.

(Emphasis ours).

■ The rules governing conflict of interest are primarily concerned with protecting the client's confidential disclosures and ensuring the attorney's loyalty to the client's interests. *Davila v. Asset Conservation, Inc.,* 147 F.R.D. 12, 14 (D.P.R. 1993). "Loyalty is an essential element in the lawyer's relationship to a client." Model Rules of Prof'l Conduct R. 1.7 (1983) cmt. 1. "As a general proposition,

---

7. *See* Local Rule 211(4)(B) (ed.1984). *See also, Schneider v. Colegio de Abogados de P.R.,* 187 F.3d 30, 40 n. 16 (1st Cir.1999); *Somascan Plaza,* 187 F.R.D. at 38; *Standard Quimica De Venezuela v. Central Hispano Int'l, Inc.,* 179 F.R.D. 64 (D.P.R.1998); *Figueroa–Olmo v. Westinghouse Elec. Corp.,* 616 F.Supp. 1445, 1451 (D.P.R.1985) applying the 1983 standard. This District adopted the 2002 revised version of the Model Rules via the amended Local Rules which went into effect on September 26, 2003. *See* Local Rule 83.5(a).

8. Subsequent conflicts prompted by previous legal representations are covered instead by the "substantially related" test found at Rule 1.9(a). *Ramos Laboy v. Trujillo Panisse,* 213 F.Supp.2d 54, 56 (D.P.R.2002); *Reyes Cañada,* 193 F.Supp.2d at 411, and *Somascan,* 187 F.R.D. at 38. Model Rules of Prof'l Conduct Rule 1.9(a) (1983) proscribes an attorney "who has formerly represented a client in a matter... [from] thereafter represent[ing] another person in the **same or substantially related matter** in which that person's interests are materially adverse to the interests of the former client". (Emphasis ours).

loyalty to a client prohibits undertaking representation directly adverse to that client". *Id.* cmt. 3.

Each of the two subsections of Rule 1.7 deals with a different conflict scenario. Part (a) pertains to situations involving opposing parties with adverse interests whereas subsection (b) relates to simultaneous representation of clients who albeit their similar interests, also have incongruous litigation positions or the potential therefor exists.

Paragraph (a) prohibits representation of opposing parties in a litigation. Simultaneous representation of parties whose interests in litigation may conflict, such as coplaintiffs or codefendants is governed by paragraph (b). An impermissible conflict may exist by reason of substantial discrepancy in the parties' testimony, incompatibility in positions in relation to the opposing party or the fact that there are substantially different possibilities of settlement of the claims or liabilities in question... [C]ommon representation of persons having similar interests is proper if the risk of adverse effect is minimal and the requirements of paragraph (b) are met.

Model Rules of Prof'l Conduct Rule 1.7 (1983) cmt. 7.

Loyalty to a client is also impaired when a lawyer cannot consider, recommend or carry out an appropriate course of action for the client because of the lawyer's other responsibilities or interests. The conflict in effect forecloses alternatives that would otherwise be available to the client. Paragraph (b) addresses such situations. A possible conflict does not itself preclude the representation. The critical questions are the likelihood that a conflict will eventuate and, if it does, whether it will materially interfere with the lawyer's independent professional judgment in considering alternatives or foreclosure courses of action that reasonably should be pursued on behalf of the client.

*Id.*, cmt. 4.

■ Both actual or potential conflicts in concurrent representations may be disabling. *Figueroa–Olmo*, 616 F.Supp. at 1451–2. Even though the rule allows for clients' waivers, unsurmountable conflicts call for counsel's withdrawal regardless of the parties' consent. *Id.* at 1451.

A client may consent to representation notwithstanding a conflict. However, as indicated in paragraph (a)(1) with respect to representation directly adverse to a client, and paragraph (b)(1) with respect to material limitations on representation of a client, when a disinterested lawyer would conclude that the client should not agree to the representation under the circumstances, the lawyer involved cannot properly ask for such agreement or provide representation on the basis of the client's consent.

Model Rules of Prof'l Conduct Rule 1.7 (1983) cmt. 4.

### ADVERSE INTERESTS OR POTENTIAL FOR CONFLICT

■ Plaintiffs argue that the interests of JRISS and REINTJES are adverse to each other and warrant disqualification. Even though at first blush it might appear so and that consequently, their relationship would be governed by subsection (a), upon a closer examination of the particular interests of both REINTJES and JRISS it would seem rather that their stakes and concerns place them on common grounds in opposition to that of plaintiffs rather than adverse to each other.

The essence of JRISS' claim against REINTJES is payment of monies allegedly due for added overtime and increased

costs incurred by JRISS resulting from delays and disruption in the work occasioned by ALSTOM.[9] According to the record, REINTJES concedes as much and is prosecuting these claims on JRISS's behalf by including them as part of the demands listed in its counter-claim.[10]

Codefendant REINTJES has similar claims. "Reintjes' and JRISS's interests stem from the work both companies performed for plaintiffs. Plaintiffs caused, and later refused to pay for, delays in both Reintjes' and JRISS's work." Response and Opposition to Plaintiffs' Motion for Disqualification (docket No. 84) ¶ 26 p. 10.

This commonality of interests is evinced by fact that REINTJES and JRISS have been working together in determining the correct amount due JRISS for submission to plaintiffs. In his declaration MR. FOX[11] attests to the fact that: both REINTJES and JRISS have claims caused by ALSTOM's delays and disruptions (¶ 4); it was REINTJES which "prepared a delay and disruption claim for the increased costs incurred by [both] JRISS and Reintjes" (¶ 5); because of their "close working relationship and common interests, Reintjes obtained JRISS's backup for the JRISS delay and disruption claim against Reintjes, prepared the JRISS's delay and disruption claim for JRISS, and submitted the JRISS claim to ALSTOM as part of Reintjes' claim" (¶ 7), and that this matter "was approached by JRISS and Reintjes from the outset as a combined effort" (¶ 8).

Their alignment is further confirmed by the fact that MR. RUIZ himself requested attorney FOX, counsel for REINTJES, to also represent JRISS at the two depositions.[12]

REINTJES and JRISS disagree, however, on the applicable payment method of JRISS's outstanding claim, i.e., whether payment by REINTJES should be made forthwith or if contingent on payment by plaintiffs and whether or not payment should be recovered from the surety. It is a conflict which emanates from their relationship which plaintiffs qualify as insurmountable.

According to the evidence before us, the simultaneous representation essentially existed for a short period of time entailed in the preparation of the witnesses for their depositions and for the taking of the depositions themselves.[13] LESLIE ALVARA-

---

9. The original claim by JRISS was for $1,091,994.79. *See* JRISS September 30, 2002 letter attached to Plaintiffs' Motion for Disqualification (docket No. 70) Exh. G. This amount was subsequently increased to $2,115,310.00. *See* JRISS November 22, 2002 letter attached to Plaintiffs' Motion for Disqualification (docket No. 70) Exh. H.

10. According to plaintiffs, even though "the Reintjes claim against [them] has fluctuated over time" Plaintiffs' Motion for Disqualification (docket No. 70 ¶ 11(a) p.7), the extant Counter-claim seeks payment "in excess of $5,516,088.46". *Id.*, n.6 p.7 (emphasis ours).

11. *See* Duane J. Fox Statement under Penalty of Perjury, attached to the Response and Opposition to Plaintiffs' Motion for Disqualification (docket No. 84).

12. According to his deposition testimony, shortly before the two depositions MR. RUIZ contacted attorney FOX to represent the interests of JRISS thereat. Specifically, MR. RUIZ testified that "I needed some counsel because I wanted the people who were going to have to come for deposition to have some legal—at that moment, we didn't know somebody else for that deposition, and I wanted by people to be, you know, under some legal counseling." Plaintiffs' Motion for Disqualification (docket No. 70) Exh. M–5.

13. At the deposition of MR. RUIZ attorney FOX indicated that he was representing both REINTJES and JRISS. Additionally, he spoke on JRISS's behalf with respect to a document production matter which arose during the course of the deposition. However, when plaintiffs' counsel followed-up the

DO, ESQ. was also present during the deposition of JOSE RUIZ and entered an appearance on his behalf.[14] The objections raised by MR. FOX during the taking of the depositions dealt exclusively with his communications with the deponents. Lastly, MR. RUIZ consented to the dual representation.[15].

In *Figueroa–Olmo* and *Davila* **both** the client and/or former client were parties in the **same** proceeding where the attorney imputed with a conflict was employed. However, JRISS is not a party to this action nor was it a party in proceedings pitting one entity against the other at the time the depositions were taken. Further, there is no evidence on the record of any other outstanding proceeding involving both JRISS and codefendant wherein MR. FOX and/or his law firm have entered an appearance for either entity which would compromise counsel's duty of loyalty and obligation to pursue his client's best interests.

The fact that such a situation may arise at a future date is not sufficient to order disqualification at this time particularly given the complex nature of the controversies arising from the contract work at issue and the time and efforts invested by REINTJES and its attorneys in both prosecuting their claims and defending against plaintiffs' charges. The balance of the interests involved as well as the hardship

and financial burden disqualification would entail does not warrant the immediate termination of REINTJES' choice of counsel.

We concede that MR. FOX's appearance at the two depositions may have been imprudent manifesting a failure on his part to give the possible ramifications of his decision much thought. However, because this mechanism is to be used with caution and concurrent representation was limited to discovery proceedings while the parties still operated under a commonality of interests the request for disqualification of counsel is **DENIED**.[16]

## CONCLUSION

Based on the foregoing, Plaintiffs' Motion for Disqualification of Counsel and for Sanctions,[17] filed on August 25, 2003 (docket No. 70) is **DENIED**.

IT IS SO ORDERED.

---

document production with MR. FOX on June 24, 2003 on that same date MR. FOX replied that "as Leslie Alvarado now represents JRISS, you can direct requests for JRISS documents to him." Plaintiffs' Motion for Disqualification (docket No. 70) Exh. O. This was again confirmed on August 8, 2003 via an e-mail wherein MR. FOX stated that "[w]e no longer represent JRISS. Leslie Alvarado represents JRISS." *Id.*

14. Plaintiffs' Motion for Disqualification (docket No. 70) Exh. M–3.

15. Duane J. Fox Statement under Penalty of Perjury, attached to the Response and Opposition to Plaintiffs' Motion for Disqualification (docket No. 84) ¶ 19.

16. Given the court's determination the petition for sanctions related to discovery on this issue is likewise **DENIED**.

17. *See also* Response and Opposition, filed by REINTJES on October 3, 2003 (docket No. 84) and Plaintiff' Reply tendered on October 24, 2003. Leave to file a reply is **GRANTED**. *See* Plaintiffs' Motion Tendering Reply, filed on October 24, 2003 (docket No. 88).