70

UNITED STATES, Appellee,

v.

Tereasa HICKS, Private First Class,
U.S. Army, Appellant.

No. 97–0432.
Crim.App. No. 9502205.

U.S. Court of Appeals for
the Armed Forces.

Argued May 11, 1999.

Decided Sept. 30, 1999.

GIERKE, J., delivered the opinion of the Court, in which COX, C.J., and CRAW-FORD, J., joined. SULLIVAN and EF-FRON, JJ., filed dissenting opinions.

For Appellant: *Colonel John T. Phelps, II* (argued); *Lieutenant Colonel Adele H. Odegard, Major Leslie A. Nepper,* and *Captain John C. Einstman* (on brief).

For Appellee: *Captain Kelly R. Bailey* (argued); *Lieutenant Colonel Eugene R. Milhizer* (on brief); *Captain Mary E. Braisted.*

Judge GIERKE delivered the opinion of the Court.

A special court-martial composed of officer and enlisted members convicted appellant, contrary to her pleas, of willfully disobeying a lawful command from a superior commissioned officer and communicating a threat, in violation of Articles 90 and 134, Uniform Code of Military Justice, 10 USC §§ 890 and 934, respectively. The order in question was a "no contact" order, prohibiting appellant from having contact with the estranged wife of Corporal (CPL) B and her children. Appellant had admitted that she was involved in a romantic relationship with CPL B and was pregnant with his child. However, because the lawfulness of the order was stipulated, evidence of this admission was not disclosed to the members.

The adjudged and approved sentence provides for a bad-conduct discharge, confinement and partial forfeiture of pay for 6 months, and reduction to the lowest enlisted grade. The Court of Criminal Appeals affirmed the findings and sentence in an unpublished opinion.

This Court remanded the case for further factfinding and a determination whether appellant was represented at trial by conflict-free counsel. 49 MJ 158 (1998). The Court of Criminal Appeals obtained an affidavit from appellant, asserting that she disobeyed the no-contact order because a civilian lawyer, who also represented her at this special court-martial, "advised [her] not to obey the order because it was bias [sic] and vague," and because CPL [B] "was never given the opportunity to rebute [sic] the order."

The Court of Criminal Appeals did not obtain an affidavit from the civilian lawyer. Therefore, there is no conflict of affidavits to be resolved. *See generally, United States v. Ginn*, 47 MJ 236 (1997).

Upon further review, the Court of Criminal Appeals rejected appellant's claim of ineffective representation. The court's reasoning was as follows:

Appellant testified twice under oath during the merits, stating that she did not violate the terms of the order because the incident in question did not happen at Mrs. B's house. Appellant never stated or inferred that her civilian lawyer (the same attorney who represented her at her court-martial) told her: (1) to violate the order; or (2) that she could violate the order without any possibility of punishment. Further, appellant did not testify or imply that she violated the order because she mistakenly believed that to do so was not a crime.

The court held that appellant received effective assistance of counsel and found that her disobedience "was the product of her knowing and willful choice to violate the order, and not the result of any ineffective assistance of counsel or conflict of interest." Unpub. op. at 2.

This Court granted review of the conflict-of-interest issue.[1] Appellant argues that, in order for her civilian lawyer to effectively represent her, he would have had to raise the defense of mistake due to erroneous pre-trial legal advice, thereby admitting his incompetence. Final Brief at 4. Thus, appellant argues that the lawyer had an actual conflict of interest, *id.* at 7, because he could not effectively defend appellant and defend the propriety of his own conduct at the same time. For the reasons set out below, we disagree.

The order in question was given to appellant in writing by her commander, Captain (CPT) Gervais. It includes the following directive language:

2. I order you to have no contact [with Mrs. B], or her children, except for required court appearances or command directed appearances.

3. I order you not to visit, see, speak to, nor be in the immediate vicinity of [Mrs. B], or her children. Whether you are on or off duty you are not to touch, go near, speak to, talk on [the] phone to, write to or send any message to [Mrs. B], or her children. You are not to go near [Mrs. B's residence].

At trial, appellant's defense counsel (the same civilian attorney referred to in appellant's affidavit) made a motion *in limine* to preclude appellant's commander from testifying about the reasons for issuing the order. The military judge declined to grant the motion *in limine*, opining "that if the lawfulness of an order is challenged, then the Government's entitled to show what the commander's basis for [issuing] the order is." Defense counsel then informed the military judge that the defense did not "intend to challenge the lawfulness of the order." Defense counsel stated, "Our position is it was a

---

WHETHER APPELLANT WAS DENIED HER SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL BECAUSE OF THE CONFLICT OF INTEREST RAISED BY HER CIVILIAN DEFENSE COUNSEL'S REPRESENTATION AT COURT–MARTIAL WHEN HIS ERRONEOUS LEGAL ADVICE REGARDING THE LAWFULNESS OF APPELLANT'S COMMANDER'S ORDER LED TO ONE OF THE CHARGES AGAINST HER.

lawful order." Thereafter, trial counsel and defense counsel, with the express consent of appellant, stipulated that the order was given and that it was a lawful order.

CPT Gervais testified that she gave the order on February 22, 1995, at 1:15 p.m. She testified that appellant disobeyed it within 40 minutes after it was given. A "General Counseling Form" reflects that CPT Gervais received a telephone call from Mrs. B, complaining that while she was talking to CPL B on the telephone, appellant called her vulgar names. Appellant signed the form, indicating that she concurred in the accuracy of the information on it.

CPT Gervais counseled appellant about the order again on April 11, 1995. On this date, Mrs. B called CPT Gervais and complained that CPL B and their son "were residing" with appellant. Appellant declined to concur in the accuracy of the counseling form. She wrote, "I nonconcur do [sic] to the grounds that I was advised by my civilian attorney that the command order was bias [sic] and that CPL [B] has every right to have his child in any visinity [sic] he deems proper, due to the grounds that coustady [sic] has not been determined by a court of law."

The theory of the prosecution was that appellant disobeyed the order by being in Mrs. B's house and the yard. The theory of the defense was that appellant attended a barbecue at a house approximately 1000 feet from Mrs. B's house, parked her car 300–400 feet from Mrs. B's house, and was never "near" the house or Mrs. B. Appellant testified that she did not disobey the order and that she was never in the house or the yard, and she supported her testimony with corroborating witnesses. The prosecution produced testimony that appellant and CPL B were seen in the house and the yard.

■ When an alleged conflict of interest is at issue, "a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 348, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), quoted in *United States v. Breese*, 11 MJ 17, 20 (CMA 1981). The burden of proof is on the defense. *United States v. Calhoun*,

49 MJ 485, 489 (1998), citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

■ An allegation of ineffective representation presents a mixed question of law and fact, which we review *de novo*. *United States v. Smith*, 44 MJ 459, 460 (1996).

■ Appellant voluntarily stipulated that the order was given and that it was lawful. She does not assert, and the record does not show, that this stipulation was the product of any concern by her civilian attorney for protecting himself from an accusation of giving bad advice.

Although defense counsel criticized the order for vagueness in both his opening statement and closing argument, the focus of his criticism was on the term "near." Appellant's complaints about the vagueness of the order before and after trial concerned the question how "near" to Mrs. B she could be without violating the order. Appellant's complaint at her second counseling session was about applicability of the order to contact with CPL B's son. At no time before, during, or after trial has appellant contended that she thought that being in Mrs. B's house or yard would not violate the order.

The factual contest at trial was a credibility battle. The pivotal issue was not the legality of the order; it was whether appellant was at Mrs. B's house. The Government witnesses said appellant was in Mrs. B's house and the yard. Appellant and her witnesses said that she was never closer than 300 feet from Mrs. B's residence. There was no issue whether 300 feet from the house was near enough to violate the order. Thus, defense counsel had no actual conflict of interest.

The court below found that appellant was effectively and vigorously defended. We agree.

The decision of the United States Army Court of Criminal Appeals on remand is affirmed.

SULLIVAN, Judge (dissenting):

When I review the facts of this case, I think of this core idea expressed by Oliver Wendell Holmes, Jr.:

When we study law we are not studying a mystery but a well-known profession. We are studying what we shall want in order to appear before judges, or to advise people in such a way as to keep them out of court.... People want to know under what circumstances and how far they will run the risk of coming against what is so much stronger than themselves [the public force of the courts].

"The Path of Law," *Collected Legal Papers* 167 (New York: Harcourt, Brace and Company, 1921). More particularly, one of the more noble functions of the profession of law is giving people advice which will keep them from being charged with a crime and tried in a court of law. In this case there is unrebutted evidence before us that the profession of law may have failed Private First Class (PFC) Tereasa Hicks in this vitally important matter.

In the trial record and in an unopposed affidavit filed during this long appeal, there is evidence that

1. PFC Hicks, as a result of a domestic dispute, was given an order by a superior officer "not to go near" Mrs. B's residence.

2. After receiving this order, Hicks received advice from a civilian attorney [Mr. Hansrote] that she didn't have to follow "the order, because it was bias [sic] and vague."

3. After receiving this legal advice, Hicks apparently violated the order.

4. After this violation of the order, she was court-martialed and convicted of willfully disobeying the order of a superior commissioned officer (as well as communicating a threat).

5. At trial, Hicks was represented by Mr. Hansrote, the very attorney who gave her the legal advice before she disobeyed the order.

Thus, the evidence in this record is that Hicks disobeyed an order only after receiving legal advice that the "company commander did not make the order clear enough to be followed." Unfortunately, the defense attorney did not clear up this unrebutted view of Hicks that she violated the order only after receiving advice from Mr. Hansrote ("After I received this advice I did not follow the order."). I cannot join the majority in affirming appellant's convictions in these circumstances.

To better illustrate the conflict of interest in this case, it might be helpful to draw an analogy between appellant's case and a civilian case where criminal charges might result from a client's receiving bad advice from his attorney. *See United States v. Poludniak,* 657 F.2d 948, 959 (8th Cir.1981) (advice of counsel can be considered on question of criminal willfulness), *cert. denied sub nom. Weigand v. United States,* 455 U.S. 940, 102 S.Ct. 1431, 71 L.Ed.2d 650 (1982). If PFC Tereasa Hicks had received bad tax advice from attorney A before filing her federal income tax and if Hicks had been indicted on federal-income-tax charges as a result of filing a false income-tax return, it would almost be impossible to imagine that attorney A would be allowed to represent Hicks at trial. *Para Technologies Trust v. Commissioner,* T.C. Memo 1992–575, 64 T.C.M. (CCH) 922 (1992) (*see* Appendix). *See* W. LaFave and A. Scott, *Substantive Criminal Law,* § 5.1(e)(4) at 596 n. 131. Moreover if attorney B did try this case for Hicks, it is impossible to imagine that attorney B would *not* put attorney A (who gave the bad tax advice) on the stand as the principal witness for the defense. *See United States v. Cancilla,* 725 F.2d 867, 870–71 (2d Cir.1984).

The majority (like the court below in their unpublished opinion) focus on everything but the conflict-of-interest issue. They conclude:

1. "Defense counsel then informed the military judge that the defense did not 'intend to challenge the lawfulness of the order.'" 52 MJ at 71.

2. That there "was a credibility battle" at trial on whether the order was violated. *Id.* at 72.

3. That the civilian defense counsel "effectively and vigorously defended" appellant. *Id.* at 72.

Yet resolution of these points does not determine the core of the granted issue on "the conflict of interest ... [arising] when [that defense counsel's] erroneous legal ad-

vice regarding the lawfulness of appellant's commander's order led to one of the charges against her." No, defense counsel's informing the judge that he will not challenge the legality of the order is precisely what a conflicted attorney would do in order to avoid embarrassing himself by revealing to the court that before his client violated the order, he told her the order was not lawful. As for his client's losing the "credibility battle," that is not relevant to whether Hicks' trial attorney had a conflict. With regard to the defense counsel "effectively and vigorously" defending appellant, that is not determinative of whether he had a conflict. The defense counsel is not charged with a lack of vigor but with having a conflict of interest. Neither the trial record nor the majority opinion adequately answer the conflict-of-interest issue.

Here, Mr. Hansrote gave bad legal advice to PFC Hicks before she violated the no-contact order (as the evidence at trial and the unrebutted affidavit of Hicks indicates). He should never have represented Hicks at the trial because the "probity of [his] own conduct" was a "serious question" at this court-martial. ABA Model Rules of Professional Conduct 1.7(b) and Comment to Rule 1.7 (*Lawyer's Interests* ) (1989); *see United States v. Sorbera*, 43 MJ 818 (A.F.Ct.Crim. App.1996). If Mr. Hansrote had refused to represent Hicks at trial because of his conflict of interest, another conflict-free attorney most likely would have called Mr. Hansrote as a witness to tell the jury that his advice to Hicks led to her court-martial on the charge of disobeying an order. While I will not make any holding on whether the evidence of the bad legal advice would have saved Hicks from a conviction, since the general rule in the military is that one disobeys orders at one's peril, I will hold that evidence of the advice that was given to Hicks certainly should have been brought out at the sentencing hearing in extenuation of Hicks' conduct. *See* RCM 1001(c)(1)(A), Manual for Courts–Martial, United States (1995 edition) *; para.

216(j), Manual for Courts–Martial, United States 1969 (Revised edition). A conflict-free attorney should have made this key argument at sentencing.

What I think needs to be done in this case is to remand it for a hearing under *United States v. DuBay*, 17 USCMA 147, 37 CMR 411 (1967), to resolve this conflict-of-interest issue. *See generally United States v. Smith*, 36 MJ 455, 457 (CMA 1993). PFC Hicks claims that she was defended at trial by an attorney who advised her not to obey the order that she was found guilty of violating. Clearly, a court-martial based on due process of law demands that a client be represented by an attorney free of such a conflict. *See generally United States v. Breese*, 11 MJ 17, 19 (CMA 1981). Let us make sure that PFC Hicks received such representation at this trial. The record before us now does not give us that assurance.

APPENDIX

PARA TECHNOLOGIES TRUST, et al.,[1] Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

Nos. 12089–91, 12242–91 and 12445–91.

United States Tax Court

Sept. 28, 1992.

Joe Alfred Izen, Jr., for petitioners.

Paul B. Burns, for respondent.

MEMORANDUM OPINION

COHEN, Judge.

Each of these cases is before the Court for ruling on respondent's Motion to Compel Withdrawal of Petitioners' Counsel of Record for Conflict of Interest. The issue for decision is whether a conflict of interest exists that requires the disqualification of petitioners' counsel of record. Unless otherwise in-

---

* This Manual provision is cited to the version applicable at trial. The 1998 version is unchanged.

1. Cases of the following petitioners are consolidated herewith: Tom Anderson, docket No. 12242–91; and Fred Ferber, docket No. 12445–91.

dicated, all section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Petitioners Para Technologies Trust (Para Tech) and Tom Anderson (Anderson) had their principal places of business in California at the time they filed their petitions. Petitioner Fred Ferber aka Frederick Ferber (Ferber) resided in California at the time he filed his petition. (Anderson resided in Oregon at the time of hearing on the pending motions in March 1992, but the record is silent with respect to his residence at the time he filed his petition.)

Background

Nassau Life Insurance Company, Ltd. (Nassau Life), promoted the use of domestic and foreign entities to shelter United States business and investment income from United States Federal income taxation. Nassau Life engaged in this activity through representatives known as "information officers" and through the dissemination of printed materials. From 1982 through 1988, Joe Alfred Izen, Jr. (Izen), was counsel to Nassau Life. In the course of that representation, among other services, he prepared and issued two opinion letters that related to the multiple-entity tax shelter promoted by Nassau Life. In a legal opinion letter dated September 26, 1983, Izen discussed the legal status of "contractual trust companies" that were being promoted by Nassau Life (the 1983 opinion letter).

Ferber is a songwriter with a high school education. Anderson completed the eighth grade. At the time of hearing on the pending motions, Ferber was 36 years old and Anderson was 30 years old.

Ferber and Anderson met in India in 1977 and became friends. In late 1984, Anderson began to engage in an electronics business, VideoLab, as a sole proprietor. Because of his limited education, Anderson wanted to adopt a structure for VideoLab that would minimize the amount of paperwork that was necessary to carry on the business. He discussed his plans with Ferber, who was then employed as an information officer for Nassau Life. Ferber, relying at least partially on the 1983 opinion letter, advised Anderson, who also had access to the 1983 opinion letter, to structure his business as a trust such as those promoted by Nassau Life.

In January 1985, Anderson formed Para Tech as a common-law business trust. From its creation and thereafter, Para Tech conducted the business in which VideoLab had previously been engaged. Ferber was the trustee of Para Tech. The beneficial owner of Para Tech was another trust, Atram Investment Group (Atram), formed under the laws of the Turks and Caicos Islands, British West Indies. Anderson was one of the beneficiaries of Atram.

In a legal opinion letter prepared for Nassau Life dated June 20, 1985, Izen discussed the tax aspects of contractual trust companies (the 1985 opinion letter). Among other things, the letter concluded that the grantor trust provisions of the Internal Revenue Code did not apply to "contractual trust companies". Izen's letter failed to discuss decided cases contrary to the positions he was espousing. Anderson and Ferber gained access to the 1985 opinion letter.

Respondent determined deficiencies in petitioners' Federal income taxes for 1987 and 1988. Respondent determined that Para Tech was an association taxable as a corporation for Federal income tax purposes and disallowed its claimed distribution deductions. Respondent determined that Anderson and Ferber were each taxable on an amount equal to the taxable income of Para Tech. Respondent asserted three alternative theories in support of this determination. First, because Para Tech should be taxed as a corporation and because of their control over Para Tech and Atram, Anderson and Ferber were in constructive receipt of dividend income equal to the amounts transferred from Para Tech to Atram. Second, if Para Tech was a trust, it was a grantor trust owned by Anderson and Ferber, who were therefore taxable on Para Tech's income. Third, because both Para Tech and Atram were sham entities that should be disregarded for Federal income tax purposes,

Anderson and Ferber are taxable on the income from Para Tech's business. Respondent also determined that all three petitioners are liable for additions to tax for fraud.

Para Tech, Anderson, and Ferber filed petitions for redetermination with this Court. Izen is counsel of record for petitioners in these cases. Nassau Life is bankrupt. All legal fees are being paid by Para Tech. No discovery and no settlement negotiations have taken place, and none of the cases has been set for trial.

Respondent's counsel in these cases wrote letters to Izen dated September 19, 1991, and November 15, 1991, questioning Izen regarding possible conflicts of interest in his representation of petitioners. Izen did not respond to these letters. Respondent, therefore, moved the Court to compel withdrawal of Izen as petitioners' counsel.

## Discussion

Petitioners contend, based on *Appeal of Infotechnology, Inc.*, 582 A.2d 215 (Del. Supr.1990), that respondent lacks standing to make this motion because a nonclient litigant does not have the power to enforce a technical violation of the Model Rules of Professional Conduct (Model Rules). These cases, however, are distinguishable from Appeal of Infotechnology, Inc., supra, in which the court held that it had "become apparent that * * * [the opposing party] was seeking to use disqualification as a litigation tactic." *Id.* at 221. The Court is generally reluctant to disqualify counsel of a taxpayer's choice on motion of the adversary. See *Alexander v. Superior Court,* 141 Ariz. 157, 685 P.2d 1309, 1317 (1984). In these cases, however, respondent promptly moved for disqualification prior to conducting discovery or engaging in settlement negotiations and before these cases were set for trial. See *Duffey v. Commissioner,* 91 T.C. 81, 84 (1988).

Rule 201(a) provides that "Practitioners before the Court shall carry on their practice in accordance with the letter and spirit of the Model Rules". This Court, therefore, has the power to compel withdrawal of petitioners' counsel if such representation would violate the Model Rules. Specifically, Rule 24(f) provides:

If any counsel of record (1) was involved in planning or promoting a transaction or operating an entity that is connected to any issue in a case, [or] (2) represents more than one person with differing interests with respect to any issue in a case, * * * then such counsel must either secure the informed consent of the client * * *; withdraw from the case; or take whatever other steps are necessary to obviate a conflict of interest or other violation of the ABA Model Rules of Professional Conduct, and particularly [Rule] 1.7 * * *

Rule 24(f), which became effective July 1, 1990, emphasizes the provisions of the Model Rules to which practitioners before this Court were already subject. Rule 24(f) was added "to insure that the bar of this Court disclose or rectify any conflict of interest." Rules of Practice and Procedure of the United States Tax Court, 93 T.C. 821, 858, Note.

Model Rule 1.7(b) provides:

A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

(1) the lawyer reasonably believes the representation will not be adversely affected; and

(2) the client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

Petitioners contend that Izen's representation of them does not violate Model Rule 1.7(b) because no potential conflict of interest exists among petitioners. Petitioners contend that each petitioner is contesting the deficiency and will argue that Para Tech should be recognized as a trust and that Para Tech's Federal income tax returns for 1987 and 1988 were correct.

Respondent contends that Izen's representation of each petitioner may be materially limited by his responsibilities to the other

petitioners and by his own interests. Respondent states:

There are positions which can be advanced on behalf of each Petitioner which, if established, would enable that Petitioner to avoid liability for all or part of the deficiencies and additions to tax determined against that Petitioner, but which cannot be established without irreparably damaging some other Petitioner's case.

As set forth above, respondent determined that Anderson and Ferber were each taxable on an amount equal to the taxable income of Para Tech. One of respondent's alternative theories is that Para Tech is a grantor trust. Generally, the grantor trust rules apply to a person, such as Anderson, who created the trust. See secs. 671 through 678. Anderson formed the trust and transferred his business to it and is a beneficiary of the trust. Ferber, although serving as a trustee, is less likely to be a grantor. Ferber, and, hypothetically, Para Tech, would avoid taxation if respondent successfully established that the income was taxable to Anderson as the grantor.

Further, respondent has determined that each petitioner is liable for the additions to tax for fraud. In support of that determination, respondent's answer alleges that books and records made available to respondent during the examination of petitioners' returns were false and fraudulent, that petitioners "individually and in concert, refused to cooperate with Respondent's agents and attempted to obstruct Respondent's examination by various means", and that each petitioner understated or failed to report taxable income and tax due from them. In this regard, Anderson and Ferber can each argue that the other was responsible for maintaining the books and records of Para Tech and for preparing its tax returns and that each relied on the other. Each may also claim that he relied on Izen's opinion letters. In addition, Ferber, as trustee of Para Tech, is putatively making decisions for Para Tech, including using its funds to pay for litigation of these cases, while Anderson, not Ferber, has a beneficial interest in Para Tech.

Although it is too early in this litigation to anticipate all of the arguments that will be made, and the foregoing possibilities may not be the positions that petitioners should or will adopt at trial, there is a serious possibility that petitioners' positions may become adverse to each other. See *Figueroa–Olmo v. Westinghouse Elec. Corp.*, 616 F.Supp. 1445, 1451–1454 (D.Puerto Rico 1985); *Shadid v. Jackson*, 521 F.Supp. 87, 89 (E.D.Tex. 1981).

Izen's personal interests in this case may also conflict with the interests of petitioners. Anderson and Ferber relied, at least partially, on opinion letters that Izen had written. Therefore, Izen has an interest in vindicating the positions he took in the opinion letters in order to maintain his professional reputation and to protect himself from any potential future liability to petitioners. See, e.g., *Eisenberg v. Gagnon*, 766 F.2d 770, 779–780 (3d Cir.1985) (holding that investors in a tax shelter could recover from an attorney who had misrepresented facts relating to the tax shelter). He would therefore be less likely to advise petitioners disinterestedly with regard to such matters as accepting a settlement offer. See Model Rules Rule 1.7(a) and 1.7 comment (1983) (stating that, "If the probity of a lawyer's own conduct in a transaction is in serious question, it may be difficult or impossible for the lawyer to give a client detached advice."). See also *Adams v. Commissioner*, 85 T.C. 359, 372–373 (1985). Izen's failure to advise petitioners of the potential adverse defenses or affirmative claims available to them would constitute a breach of his duty of loyalty to them. *Figueroa–Olmo v. Westinghouse Elec. Corp.*, supra at 1453–1454; *Eriks v. Denver*, 118 Wash.2d 451, 824 P.2d 1207, 1211–1212 (1992) (citing Model Rules Rule 1.7 comment (1984) and holding that as a matter of law there was a conflict of interest between promoters of and investors in a tax shelter). Finally, Izen is potentially a witness with respect to matters set forth in his tax opinion, and testimony on that subject could appropriately be obtained without violation of the attorney-client privilege. See *In re Grand Jury Proceedings*, 727 F.2d 1352 (4th Cir.1984); and

*United States v. Jones,* 696 F.2d 1069 (4th Cir.1982).

Izen and petitioners contend that petitioners have been informed of and waive Izen's conflict of interest. We are not persuaded, however, that the apparent consent of petitioners is informed and voluntary. They testified that they had no intention to sue either Nassau Life or Izen and that they understood that, if a dispute arose between Anderson and Ferber, Izen would have to withdraw. Neither Izen nor petitioners identified any disclosures of the potential adverse positions that might lead to a dispute between Anderson and Ferber. In this regard, Izen's questions and Anderson's responses at the hearing included the following:

Q As far as Fred [Ferber] is concerned, was there a discussion of any kind with Joe Alfred Izen, Jr., about what would happen if Fred and yourself pointed the fingers at each other?

A Discussion with you or with Fred?

Q Either one, or both?

A We had—we had simply discussed the legal possibility that existed but did not see that as a reality or as even a plausible option for us to pursue.

Q Why wasn't it plausible?

A We both really have the same interests at heart, I believe, and I don't see what I would get out of, you know, trying to sue Fred. He has as much money as I do, which is almost nothing, so this question is going to come up later anyway, so—

Q Well, again, though, at the start of the lawsuit and with your discussions with your Attorney, Joe Alfred Izen, Jr., did you—were you and Fred Ferber more or less in agreement on the facts of how Para Technologies operated and who got what as far an any benefits or income; that's what I'm trying to ask?

A Well, yes, of course. I mean, Fred was Trustee and obviously, I need to be in agreement with what he's directing and have been, through the existence of the Trust.

Q Right. Was there any expression made that if a conflict between Fred and

yourself were to arise based on changing representation of facts, that Joe Alfred Izen, Jr., might have to withdraw?

A I'm trying to remember the timing of this, of the various issues we had discussed. We had discussed that as a possibility, but I don't recall—I don't recall having the impression at that time that that was very likely to happen.

Q Do you anticipate in this case any inconsistent defenses by you or Fred Ferber?

A No.

We are not persuaded that Izen made a full and fair disclosure or that petitioners understood the inherent potential conflicts between them. The backgrounds of the individuals suggest a lack of sophistication in assessing matters such as these, and they relied solely on the advice of Izen in deciding to waive the conflicts of interest. Compare *Adams v. Commissioner,* 85 T.C. at 372–374 (holding that taxpayers could not be relieved of a settlement agreement based on their attorney's conflict of interest because taxpayers were sophisticated, knew all of the relevant facts, and had been advised by independent counsel before employing the author of an opinion letter). It appears to us that the waiver is not based on informed consent but on the cost of employing independent and separate counsel and having such counsel become familiar with the underlying facts of the cases.

Izen admitted during the hearing on respondent's motion that he had not secured written consents or waivers from petitioners and that he had not contacted Nassau Life or other beneficiaries of the Para Tech trust. Under these circumstances, we conclude that it is "more important that unethical conduct be prevented than * * * [that petitioners] have an unfettered right to counsel of * * * [their] choice." *Kevlik v. Goldstein,* 724 F.2d 844, 849 (1st Cir.1984). The potential for unfairness to petitioners and damage to the integrity of the judicial process is too serious to permit Izen's representation of petitioners to continue, even in the face of an apparent waiver. *Figueroa–Olmo v. Westinghouse Elec. Corp., supra* at 1451; *Shadid v. Jack-*

*son, supra* at 90; and Model Rules Rule 1.7 comment (1983) (stating that, "when a disinterested lawyer would conclude that the client should not agree to representation under the circumstances, the lawyer involved cannot * * * provide representation on the basis of the client's consent.")

Therefore, Izen must be disqualified from representing petitioners in these cases.

Respondent's motions will be granted.

EFFRON, Judge (dissenting):

As the majority notes, we previously remanded this case for further factfinding and a determination whether appellant was represented at trial by conflict-free counsel. 49 MJ 158 (1998). Upon remand, the Court of Criminal Appeals obtained an affidavit from appellant who asserted that she was advised by her attorney that the no-contact order—the order that she was convicted of violating—was not a lawful order. The court below did not obtain an affidavit from counsel who allegedly provided that advice and then represented appellant at trial.

I agree with the majority that appellant did not claim at trial that she violated the order in reliance upon her attorney's advice that the order was unlawful; rather, she claimed at trial that she did not engage in any activity that violated the no-contact order in the first place. In that context, the potential conflict with her attorney was not as stark as it would have been had she claimed that her behavior was in reliance upon the attorney's advice.

Nonetheless, given the nature of the charge—willful disobedience of an order—a potential conflict remained. Appellant was faced with tactical choices at trial, including the options of: (1) not testifying, but attacking the Government's case, e.g., through cross-examination, with a view towards establishing a reasonable doubt; (2) testifying that she was not present at the site and therefore did not violate the order; or (3) adherence to that defense, but also presenting evidence of her attorney's advice for purposes of arguing to the court-martial panel that even if they found her to be present, they should take her attorney's advice into account on the issue of willfulness. Likewise, on sentencing, she was faced with similar tactical choices, in that she could have argued that, having found her to be present in violation of the order, the members should consider the effect of her attorney's advice as a matter in extenuation. RCM 1001(c)(1)(A).

In the absence of an affidavit from appellant's counsel, the court below was in no position to determine what advice appellant's counsel provided prior to the charged misconduct or the impact of that advice upon the tactical decisions at trial. I would remand so that the court below could order the necessary factfinding proceeding to make the appropriate legal determinations. *See United States v. DuBay*, 17 USCMA 147, 37 CMR 411 (1967).