**UNITED STATES, Appellee,**

v.

**Private E2 Jermain J. BEST, United States Army, Appellant.**

**ARMY 9701222.**

U.S. Army Court of Criminal Appeals.

12 April 2004.

For Appellant: Lieutenant Colonel E. Allen Chandler, Jr., JA; Major Imogene M. Jamison, JA; Captain Gregory M. Kelch, JA (on brief).

For Appellee: Lieutenant Colonel Margaret B. Baines, JA; Major Jennifer H. McGee, JA; Captain Karen J. Borgerding, JA (on brief).

Before MERCK, Senior Judge, JOHNSON, and MOORE, Appellate Military Judges.

### OPINION OF THE COURT ON FURTHER REVIEW

MERCK, Senior Judge:

A general court-martial composed of officer and enlisted members found appellant guilty, contrary to his pleas, of unpremeditated murder, assault in which grievous bodily harm was intentionally inflicted, and carrying a concealed weapon, in violation of Articles 118, 128, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 918, 928, and 934 [here-

inafter UCMJ]. The convening authority approved the adjudged sentence of a dishonorable discharge, confinement for twenty years, forfeiture of all pay and allowances, and reduction to Private E1.

## BACKGROUND

On 8 March 2000, this court affirmed the findings of guilty and the sentence. *United States v. Best*, ARMY 9701222 (Army Ct. Crim.App. 8 Mar. 2000) (unpub.).[1] On 21 November 2000, the United States Court of Appeals for the Armed Forces (CAAF) returned the record of trial to The Judge Advocate General for submission to an appropriate authority for a mental examination of appellant under Rule for Courts–Martial [hereinafter R.C.M.] 706.[2] On 12 March 2001, an R.C.M. 706 examination into appellant's mental responsibility and capacity was conducted at the United States Disciplinary Barracks (USDB), Fort Leavenworth, Kansas. The board members consisted of Doctor (Dr.) Vellore Kirubakaran, Board Certified Psychiatrist; Dr. Ellen H. Galloway, Licensed Psychologist; and Dr. Gregory T. Ellermann, Licensed Psychologist. On 29 March 2001, the board answered the following questions:

a. At the time of the alleged criminal conduct (5 April 1997), did Inmate Best have a severe mental disease or defect? (The term "severe mental disease or defect: does not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct, or minor disorders such as nonpsychotic behavior disorders and personality defects.") No

b. What is the [current] clinical psychiatric diagnosis? Schizophrenia, Catatonic Type Remission

c. Was Inmate Best, at the time of the alleged criminal conduct (5 April 1997) and as a result of such severe mental disease

or defect, unable to appreciate the nature and quality or wrongfulness of his conduct? No

d. Is Inmate Best presently suffering from a mental disease or defect rendering him unable to understand and cooperate in the appellate proceedings? No

On 20 December 2001, the CAAF set aside this court's decision and remanded the case to this court. The CAAF questioned whether the sanity board results were reliable because of a possible conflict of interest involving two doctors on the board who previously had psychotherapist-patient relationships with appellant. Specifically, in the CAAF remand, we were directed to address the following questions:

(1) Was there an actual conflict of interest [involving Drs. Galloway and Kirubakaran] sufficient to undermine the reliability of the sanity board's findings?

(2) Was appellant aware of the potential conflict of interest at the time of the sanity board?

(3) If so, did appellant have an opportunity to raise the issue?

(4) Did appellant waive [any] conflict of interest?

That, if the court concludes that there was a conflict of interest that was not waived and further concludes that the findings of the sanity board are not reliable because of a conflict of interest, the court will order another sanity board; and

That, after resolving the above issues, the court will determine whether appellant has the mental capacity to understand and to conduct or cooperate intelligently in the appellate proceedings. If so, the court will determine whether the evidence regarding appellant's mental responsibility at the time of the offenses warrants setting aside the findings and sentence. (Citations omitted).

1. Appellant did not raise the issue of his mental responsibility or capacity to this court during our initial review of his case pursuant to Article 66, UCMJ.

2. Rule for Courts–Martial 706 provides that if it appears that an accused lacks mental responsibility for any charged offense or lacks capacity to stand trial, a request for a mental examination

into the accused's mental condition shall be made. The request is referred to a board consisting of one or more persons, one of whom is either a physician or a clinical psychologist. Normally, at least one board member is either a psychiatrist or a clinical psychologist. The board must then author a report as to the accused's mental capacity, mental responsibility, or both.

We were unable to determine the facts underlying the alleged conflict of interest issue involving Drs. Galloway and Kirubakaran from the record of trial. Therefore, we ordered that a hearing be conducted pursuant to *United States v. DuBay*, 17 U.S.C.M.A. 147, 37 C.M.R. 411, 1967 WL 4276 (1967). The *DuBay* hearing was conducted and the case has now been returned to this court for further review in accordance with the CAAF's mandate.

## FINDINGS OF FACT

The facts of this case are summarized in our memorandum opinion, dated 8 March 2000, as follows:

At about midnight on 5 April 1997, appellant went to the Happy Night Disco in Idar–Oberstein, Germany, with Specialist (SPC) Fowlkes and SPC Wright. At approximately 0200 hrs, 6 April 1997, SPC Brown accidentally bumped into appellant. Specialist Brown apologized and turned away from appellant. Appellant grabbed SPC Brown by the arm, turned him around, and struck him in the face with a tall, heavy, beer glass. The glass broke on impact and cut completely through SPC Brown's cheek to his teeth. This injury required four stitches and left a permanent one-quarter to one-half inch scar on SPC Brown's face.

After appellant hit SPC Brown, several of the people near them attempted to restrain appellant. Appellant departed that area of the club and took off his easily recognizable, red and white stripe shirt and placed it under his white t-shirt. Shortly thereafter, appellant and SPC Fowlkes departed the club and waited for SPC Wright near the club entrance. A few minutes later, SPC Wright joined them and stated "a guy inside the club [ ] told three patrons to follow [appellant] and see where he was going, and hold him until they got out there[.]" Appellant asked to see SPC Fowlkes' "buck knife." Specialist Fowlkes gave it to him and appellant placed it in his pocket.

Appellant, SPC Fowlkes, and SPC Wright then proceeded toward SPC Wright's automobile. Private First Class (PFC) Little,

SPC Bos, and SPC Woods caught up with appellant and his friends. Private First Class Little grabbed appellant by the arm, turned him around, and said, "[Y]ou need to come back with us. You just busted a dude in the face, and you need to come back with us, the MPs are on their way." Appellant pulled away from PFC Little and said, "You need to back off me. Just get away," and walked across the street toward SPC Wright's car. Appellant stated that he just wanted to leave. Private First Class Little again approached appellant and told him, "[C]ome back; you got to be a man and live up to what you did." Private First Class Little pushed appellant back a couple of feet and appellant came back at him. They started wrestling and punching. Private First Class Little dropped to his knees and said, "Oh, you got to use a knife." Appellant replied, "[Y]eah motherfucker." Specialist Bos then came toward appellant. As SPC Bos did so, he put his hand behind his back and pretended to be holding a knife. Specialist Bos stated the following to appellant: "Oh, you gotta use a knife. I'm gonna show you a knife." Appellant turned and ran to SPC Wright's car and departed with his friends.

Lieutenant Colonel Marzouk, a forensic pathologist, testified that he conducted an autopsy on PFC Little's body. Private First Class Little was stabbed a total of twelve times-in the heart, left lung, left arm, left armpit and forearm. The fatal stab wound was to the left axilla, left armpit, which lacerated a major vein and artery. Private First Class Little died as a result of blood loss.

Pursuant to Article 66(c), UCMJ, 10 U.S.C. § 866, we make the following additional findings of fact:

On or about 30 September 1997, appellant arrived at the USDB, Fort Leavenworth, Kansas. Upon his arrival, he, like all inmates, went through a three-week reception process. The reception process included a battery of tests to determine appellant's current psychological state. All USDB inmates are assigned case providers. Because appellant's test results did not indicate that his

case provider needed to be a psychologist, he was assigned a mental health technician as his case provider.

Sometime in the spring or summer of 1999, appellant began "speaking in tongues" and, infrequently, fell into trances. Appellant expressed a belief that he "would be delivered from confinement and received into heaven on the evening of the new millennium." Appellant's conduct was not disruptive until his belief was not confirmed and the millennium passed.

In January 2000, appellant was on the "blotter" for two separate incidents of disobedience and he began "speaking in tongues" more frequently. Appellant's case provider requested an assessment of appellant to determine whether appellant was suffering from some type of psychosis or a religious calling. Doctor Ellen Galloway[3] was directed to assess appellant to determine the cause of his disruptive behavior. Before she met appellant, Dr. Galloway: 1) discussed his status with the head chaplain and three mental health technicians; 2) reviewed his mental health records; 3) reviewed the battery of psychological tests administered to him during the reception process;[4] and 4) researched "speaking in tongues" on an Assemblies of God web page.

On 26 January 2000, Dr. Galloway met with appellant while he was in his cell. The purpose of the meeting was to make initial contact with appellant, to gather preliminary data, and to advise appellant that she planned to spend extensive time the following day conducting a full assessment of him. Appellant refused to discuss his "speaking in tongues," trances, or religious beliefs, and refused to cooperate with any psychological testing or with the clinical interview. Appellant smiled, stated God was taking care of him, and told Dr. Galloway that he did not need any mental health intervention. He turned his head sideways and muttered "non-sensical" syllables for approximately ten seconds. After approximately five to ten minutes, appellant told Dr. Galloway that he was uncomfortable and unwilling to talk to her. At that point, Dr. Galloway stopped the interview.

On 28 January 2000, Dr. Galloway prepared a memorandum for the USDB Commandant regarding appellant's mental status. In it, Dr. Galloway stated that without more cooperation, she could not determine the driving force behind appellant's behavior. She decided that the most likely reasons for his disruptive behavior were the result of two combined factors, "traits of a personality disorder and malingering." Doctor Galloway further concluded, as follows:

> The personality disorder would have been sub-clinical in nature and exacerbated by his confinement. This would have been intensified further when his expectation of deliverance was not realized. The rigidity inherent in personality disorders would explain why he persists with his behavior despite starting to experience adverse consequences. The malingering would explain why his behavior does not follow the pattern that [the head chaplain] stated he would have expected from an individual who speaks in tongues. It would also explain his refusal to cooperate with any form of assessment . . . .

Doctor Galloway recommended, at that time, that any further disruptive or disobedient behavior should be treated as a custody and control issue rather than a mental health or religious issue. She stated that all inmates, regardless of their mental status, are expected to comply with the USDB regulations, but that a psychological issue could result in mitigating punitive action. Doctor Galloway even suggested that she be called as a witness at any board to explain the mental health circumstances.

---

3. Doctor Galloway, Chief of the Mental Health Division at the Directorate of Treatment Programs at the USDB, is a Doctor of Psychology. At the time of the *DuBay* hearing, Dr. Galloway had held her position for approximately two years as an active duty officer, captain, and for approximately one and one-half years as a civilian.

4. Doctor Galloway determined these test results were invalid because of appellant's "need to present himself in an unrealistically socially desirable light. He was unwilling to admit to even minor flaws which are considered within normal limits."

By 3 April 2000, appellant was non-communicative with the USDB non-commissioned officers, had been on the "blotter" for more disruptive behavior, and had "been refusing to eat or drink for … three or four days." A physician's assistant, who was appointed to treat appellant during his hunger strike, was alarmed with appellant's behavior and refused to engage in the hunger strike protocol until appellant was psychiatrically cleared. Doctor Galloway called Dr. Kirubakaran [5] and asked him to meet with appellant on an emergency consultation.

Doctor Kirubakaran immediately met with appellant in his cell. Appellant refused to look at Dr. Kirubakaran, did not respond to any of his instructions, kept his face covered with a blanket, constantly talked to himself, and rocked his body. Because Dr. Kirubakaran was unable to fully assess appellant's mental or physical condition, he recommended appellant be sent to the nearest emergency room for a complete examination. Later, Dr. Kirubakaran diagnosed appellant with a "psychotic disorder [not otherwise specified] and concerns about catatonia." He had appellant admitted to the psychiatric services section of the Leavenworth Veterans Administration (VA) Hospital.

The VA hospital staff initially determined that appellant was depressed and was, perhaps, "playing games" with them. The VA put appellant on anti-psychotic and mood stabilizing drugs. Appellant seemed aware of his surroundings because he shook his head "no" when asked about taking his medication and allowed the nursing staff to take his vital signs and blood. Between 5 and 6 April 2000, Dr. Galloway made more than ten phone calls to the VA doctors and nurses, and Dr. Kirubakaran, discussing appellant's physical and mental condition. The VA nurse working with appellant raised, with Dr. Galloway, the issue of appellant's actions as malingering. On 6 April 2000, the VA discharged appellant and he returned to the USDB. The VA's chief of psychiatric services stated that "1) Inmate Best was not catatonic[;] 2) Inmate Best was not in the middle of an acute psychotic episode[;] and 3) that he was filling an isolation room that another patient might need."

By 17 April 2000, appellant was again non-communicative, frequently shaking and covering his head with a blanket, and most of the time refusing to eat or drink. Doctor Galloway once more requested that Dr. Kirubakaran assess appellant. Doctor Kirubakaran met with appellant at appellant's cell for approximately fifteen to twenty minutes. Appellant appeared to be psychotic and agitated. Doctor Kirubakaran did not develop a treatment plan for appellant, however, because he was told that appellant was to be transferred to the United States Medical Center for Federal Prisons (Federal Medical Center) in Springfield, Missouri, because of his refusal to eat or drink.

On 26 April 2000, appellant was transferred to the Federal Medical Center. Initially, Dr. Robert Denny, a staff psychologist, assessed appellant and concluded that he probably had a serious psychotic disorder. Doctor Denny transferred him to the psychiatric hospital for closer observation to accurately diagnose appellant.

On 28 April 2000, appellant met Dr. Richard Frederick, a staff psychologist board certified in forensic psychology. Doctor Frederick was appellant's primary clinician—responsible for conducting assessments and determining appellant's mental health status—for approximately four months. Doctor Tom Mallory, Chief of Psychiatry, assisted in assessing and medicating appellant. Initially, they hypothesized that appellant may have been faking his illness. After weeks of observation, however, they determined that their hypothesis was illogical. "His condition was very, very serious. He was not eating. He was not responding rationally or even at all, at times. He was demonstrating very strange postural changes and mannerisms that were indicative of probably the most severe psychotic disorder."

---

5.  Doctor Kirubakaran, the psychiatry medical officer for Community Mental Health, which is part of the Munson Health Center on Fort Leavenworth, is board certified in Psychiatry, and is a consulting psychiatrist for the USDB. At the time of the *DuBay* hearing, Dr. Kirubakaran had been a psychiatrist for thirty-three years.

In early May 2000, Drs. Mallory and Frederick started appellant on an involuntary, non-consensual medication regimen because they considered appellant gravely disabled and without it, at risk of death. They began medicating appellant with very large doses of extremely powerful anti-psychotic drugs. Even with the medication, it took appellant approximately one month to respond to staff interactions in any consistent fashion. On 18 May 2000, Dr. Frederick diagnosed appellant as having "Schizophrenia, catatonic type, in acute exacerbation[.]" In early June, Drs. Mallory and Frederick augmented the anti-psychotic medication with anti-depressant medication.

Doctor Frederick advised Dr. Galloway that he thought it would be in appellant's best interest to continue his treatment at the Federal Medical Center. On 15 September 2000, a *Vitek* hearing [6] was conducted at Fort Leavenworth. Doctor Frederick testified that appellant suffered from catatonic schizophrenia. He added that many of the symptoms of the mental disorder were currently in remission because of appellant's medication regimen. Because Dr. Galloway had not had any personal contact with appellant since April 2000, she testified that she did not have a professional opinion as to appellant's current mental condition. After hearing all of the evidence, the military judge recommended that appellant remain at the Federal Medical Center for as long as the staff at the center determined it necessary.

Appellant continued his treatment at the Federal Medical Center from September 2000 until his transfer back to the USDB on 8 June 2001. Once he returned to the USDB, Dr. Kirubakaran began seeing him on a monthly basis. Appellant did "extremely well," his medication was reduced, and he did not exhibit any of the symptoms he had before. Appellant was called to testify, by the defense, at the *DuBay* hearing. He discussed his relationships with Drs. Galloway and Kirubakaran, the *Vitek* hearing, and the sanity board. He answered all of the questions of the defense counsel, trial counsel, and military judge in a logical, coherent manner.

## LAW

Whether a psychotherapist [7] has an actual conflict of interest in the context of the military justice system is an issue of first impression before this court. The American Psychological Association defines "conflict of interest" as follows:

> Psychologists [should] refrain from taking on a professional role when personal, scientific, professional, legal, financial, or other interests or relationships could reasonably be expected to (1) impair their objectivity, competence, or effectiveness in performing their functions as psychologists or (2) expose the person or organization with whom the professional relationship exists to harm or exploitation.

*Ethical Principles of Psychologists and Code of Conduct,* American Psychological Association, June 1, 2003, at § 3.06.[8]

---

6. Because the military does not have adequate facilities to provide long-term, inpatient psychiatric treatment for its prisoners, those prisoners requiring such treatment are typically transferred to the custody of the Federal Bureau of Prisons under the provisions of Article 58(a), UCMJ, 10 U.S.C. § 858(a). Before a prisoner can be involuntarily transferred from a prison to a psychiatric treatment facility, he is entitled to certain procedural safeguards, including notice, counsel, and a hearing before an independent decision-maker. *Vitek v. Jones,* 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980); Army Reg. 190–47, The Army Corrections Systems, para. 3–3 (15 Aug. 1996).

7. Military Rule of Evidence [hereinafter Mil. R. Evid.] 513, Psychotherapist-patient privilege, offers helpful guidance, defining the terms psychotherapist and patient. A psychotherapist is a

psychiatrist, clinical psychologist, or clinical social worker licensed to perform that professional service or who holds credentials to provide those services from a military health care facility. Mil. R. Evid. 513(b)(2). A patient is defined as a person who is examined or interviewed by a psychotherapist for a diagnosis or treatment of that person's mental or emotional condition. Mil. R. Evid. 513(b)(1).

8. The American Psychiatric Association and the American Medical Association do not plainly define conflict of interest in a criminal justice context. *See The Principles of Medical Ethics With Annotations Especially Applicable to Psychiatry,* American Psychiatric Association, 2001 Edition (including November 2003); *Code of Medical Ethics,* American Medical Association, July 22, 2002, at § E–8.03. The American Medical Associ-

Similar principles of objectivity and trustworthiness govern attorneys: an actual conflict of interest exists if a lawyer's own interests materially limit the representation of his or her client. Army Reg. 27–26, Legal Services: Rules of Professional Conduct for Lawyers Rule 1.7(b) (1 May 1992); *see* Model Rules of Professional Conduct Rule 1.7(b); *Mickens v. Taylor,* 535 U.S. 162, 172 n. 5, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002) (describing a " 'conflict of interest' to mean a division of loyalties *that affected counsel's performance*"). In military practice, "[w]hen an alleged conflict of interest is at issue, '[an appellant] who raised no objection at trial must demonstrate [on appeal (1) ] that an actual conflict of interest [ (2) ] adversely affected his lawyer's performance.' " *United States v. Hicks,* 52 M.J. 70, 72 (C.A.A.F.1999) (citing *Cuyler v. Sullivan,* 446 U.S. 335, 348, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), quoted in *United States v. Breese,* 11 M.J. 17, 20 (C.M.A.1981)).

■ These concepts are useful to us as we formulate an analytical framework to answer the questions our superior court posited. We conclude that an actual conflict of interest exists if a psychotherapist's prior participation materially limits his or her ability to objectively participate in and evaluate the subject of an R.C.M. 706 sanity board. Under this analytical framework, and bearing in mind the posture of this case, this court reviews de novo[9] to determine whether there was an actual conflict of interest involving Drs. Galloway and Kirubakaran that was sufficient to undermine the reliability of the sanity board's findings.

## DISCUSSION

■ We decline to adopt a presumptive rule that there is an actual conflict of interest

if a mental health provider, who has established a psychotherapist-patient relationship with an accused, also serves as a member in an R.C.M. 706 sanity board. Moreover, R.C.M. 706 does not prohibit a mental health provider, who is in a psychotherapist-patient relationship with an accused, from participating in the accused's sanity board.

■ When Dr. Galloway was directed to assess appellant in January 2000, she thoroughly investigated his case history in preparation for her meeting with him. Because appellant was uncooperative during their initial face-to-face meeting, she assessed his behavior as objectively, competently, and effectively as she could. As appellant's behavior deteriorated and he began his hunger and drinking strikes, Dr. Galloway contacted Dr. Kirubakaran and asked him to meet with appellant on an emergency consultation basis. Doctor Kirubakaran immediately met with appellant. Because Dr. Kirubakaran had difficulty assessing appellant and appellant was in obvious distress, Dr. Kirubakaran recommended appellant be sent to an emergency room for a complete examination.

Later, Dr. Kirubakaran had appellant admitted to a VA hospital so that they could conduct comprehensive psychiatric testing. Upon appellant's return to the USDB, his behavior continued to deteriorate. Doctor Galloway called upon Dr. Kirubakaran for his professional assistance, who once again immediately attended to appellant's needs. Thereafter, once appellant was transferred to the Federal Medical Center, Dr. Galloway initiated a *Vitek* hearing so that appellant could continue his treatment there. Doctor Galloway knew it was her duty to ensure appellant was properly diagnosed and treat-

---

ation does describe the patient-physician relationship as follows:

> The practice of medicine, and its embodiment in the clinical encounter between a patient and a physician, is fundamentally a moral activity that arises from the imperative to care for patients and to alleviate suffering.
>     . . . .
> The relationship between patient and physician is based on trust and gives rise to physicians' ethical obligations to place patients' welfare above their own self-interest and above obli-

gations to other groups, and to advocate for their patients' welfare.

> Within the patient-physician relationship, a physician is ethically required to use sound medical judgment, holding the best interests of the patient as paramount. . . .

*Code of Medical Ethics,* American Medical Association, July 15, 2002, at § E–10.015.

9. In the normal course of appellate practice, we would place the burden on the appellant, absent plain error, to prove an actual conflict and to show how he was prejudiced.

ed even if that meant he remained at the Federal Medical Center. There is no evidence that Drs. Galloway or Kirubakaran's prior psychotherapist-patient relationships with appellant, as described above, materially limited their ability to objectively participate in and evaluate appellant in his R.C.M. 706 sanity board. *Cf. United States v. Short*, 50 M.J. 370, 372–73 (C.A.A.F.1999) (The government drug testing expert was not prohibited from providing expert assistance to the defense.).

## DECISION

We answer CAAF's mandate [10] as follows: [11]

There was no actual conflict of interest involving Drs. Galloway and Kirubakaran. The *DuBay* record is devoid of evidence that Drs. Galloway and Kirubakaran's prior participation in a psychotherapist-patient relationship with appellant materially limited their ability to objectively participate in and evaluate appellant at his sanity board. They acted professionally and responsibly as members of appellant's sanity board and rendered their best professional judgments.

Appellant has the mental capacity to understand and to conduct or cooperate intelligently in the appellate proceedings. Rule for Courts–Martial 1203(c)(5) states, in pertinent part, that "[i]n the absence of substantial evidence to the contrary, the accused is presumed to have the capacity to understand and to conduct or cooperate intelligently in the appellate proceedings." At the *DuBay* hearing, appellant answered all questions in a cogent, forthright manner. There is no evidence in the *DuBay* record to question appellant's capacity to participate in his appellate proceedings.

There is no evidence regarding appellant's mental responsibility at the time of the offenses that warrants setting aside the findings and sentence. Appellant did not raise

the issue of mental responsibility at his court-martial. He was articulate and expressed remorse during his unsworn statement: "I said I'm sorry for what happened. I overreacted and I didn't mean for things to happen the way that they did. But at the time, I was scared. And that's it." Additionally, the sanity board found that appellant did not suffer from a severe mental disease or defect at the time of the offenses.

Accordingly, our original decision of 8 March 2000 remains in effect.[12]

Judge JOHNSON and Judge MOORE concur.

---

10. The CAAF mandate is restated *supra*.

11. As to the CAAF's second, third, and fourth questions, we answer in the negative. We are satisfied that appellant was not aware of a potential conflict of interest; he, in turn, did not have an opportunity to raise the conflict of interest

issue; and appellant did not waive any conflict of interest issue.

12. See *United States v. Ginn*, 47 M.J. 236, 238 n. 2, for an explanation of how our decision is affected when our superior court sets aside and remands for further consideration.